979 A.2d 821 (2009)
410 N.J. Super. 90
STATE of New Jersey, Plaintiff-Respondent,
v.
L.V., Defendant-Appellant.
DOCKET NO. A-3149-07T4
Superior Court of New Jersey, Appellate Division.
Argued August 18, 2009.
Decided October 8, 2009.
*822 Mark Stalford, Designated Counsel, Freehold, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney).
Kimberly Yonta, Assistant Prosecutor, argued the cause for respondent (Edward De Fazio, Hudson County Prosecutor, attorney).
Before Judges STERN,[1] C.L. MINIMAN and SIMONELLI.
The opinion of the court was delivered by
MINIMAN, J.A.D.
Defendant L.V. appeals from a final judgment of conviction for second-degree aggravated assault and second-degree reckless manslaughter entered on May 14, 2007, in which concurrent five-year sentences and three-year parole terms were imposed subject to an eighty-five percent parole disqualifier pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. She contends she ought to have been sentenced as a third-degree offender under N.J.S.A. 2C:44-1f(2) and State v. Megargel, 143 N.J. 484, 673 A.2d 259 (1996). We conclude that the sentencing judge mistakenly exercised his discretion when he refused to sentence defendant as a third-degree offender. We reverse the sentence imposed, exercise our original jurisdiction, resentence defendant as a third-degree offender, and remand for entry of an amended judgment of conviction.
On March 28, 2006, defendant, who was eighteen years old at that time,[2] pled guilty to the subject offenses pursuant to a plea agreement. The circumstances leading to the charges filed against her were detailed in the presentence investigation (PSI) report and the plea allocution. Defendant, who has an IQ of between forty-four and seventy-five and is moderately to mildly retarded, was born on September 9, 1987, in El Salvador where she lived with her grandparents and brothers until December *823 2000 when she moved to West New York.

I.
According to information contained in the PSI, which was not contested by defendant, on September 13, 2005, West New York police officers responded to a report that an infant may have fallen from a window. Police responded to the scene and observed an infant lying at the bottom of an air shaft on a pile of empty cigarette cartons, which had cushioned his fall. The infant boy's umbilical cord was still attached and he had survived the fall. He suffered bruises to his ribs and head; it was possible he had a skull fracture, but that was not established in the record on appeal. The police also discovered the mummified remains of another baby at the bottom of the airshaft.
In canvassing the building, the police entered defendant's apartment with her brother's permission. Defendant's father, J.J.V., told them defendant had been in bed with the flu since the day before. In speaking with the police, defendant denied being the mother of the baby until she was told he was still alive and being transported to Jersey City Medical Center. She then admitted she was his mother and she was transported to Palisades Medical Center. Police found blood in the bathroom, particularly around the window, and on scissors retrieved from the vanity shelf. Defendant's parents both denied knowing that she was pregnant.
Defendant ultimately informed the police her father sexually molested her for the first time when she was perhaps nine and he was visiting their family in El Salvador, or possibly when she was eleven and was visiting her parents in the United States. The initial molestation was confined to touching. Defendant's father threatened to kill her if she told anyone. Soon after she moved to West New York in December 2000, her father raped her, which he thereafter did several times a week, if not almost daily, until she was eighteen.
When her father had a day off from work, he would pick her up at school at lunchtime, take her home, rape her, and bring her back to school. After school and on weekends when defendant's mother was working, her father would rape her. Occasionally, the rapes occurred during the night when other family members were asleep. Sometimes he used physical force. Although defendant would cry and tell him "No," he threatened to kill her mother if she told anyone. Defendant was afraid of her father and never reported the abuse. By and large, her father confined her to their apartment and would not let her date, associate with girlfriends, or talk on the telephone.
Defendant became pregnant when she was about fifteen and gave birth to a baby girl in September 2003. Her father raped her throughout the pregnancy. The night her first baby was born, she had a stomach ache, which became increasing painful over the next two hours. She went to the bathroom and thought she was having a bowel movement. She began pushing and felt something come out of her vagina. It was only then she realized she was giving birth. The baby girl fell into the toilet. She was under the water and not crying; L.V. did not think her baby was alive. After tugging on the umbilical cord and delivering the placenta, defendant thought about taking her baby and leaving her somewhere she would be found, but did not know how to get her baby out of the bathroom without having her family discover her.
When defendant opened the bathroom door, her father was there and told her to *824 throw her baby out the window. He told her it was her boyfriend's baby; she denied having a boyfriend. He said she had to throw her baby out the window or he would kill her. When defendant was interviewed by the police two years later, she said she complied with her father's demand. Her father had praised her, saying she "did well." This was the baby whose mummified remains were found at the bottom of the airshaft.
After the birth of her first baby, the rapes became more aggressive and painful. Defendant stated her father "treated me very bad." Her father resumed threatening to kill her if she did not allow him to continue the rapes. She asked her father if it was possible for her to get pregnant again and he replied he did not care, she would have to do the same thing if she did. By now, she was having nightmares about the baby and the sexual abuse and had frequent thoughts and flashbacks about them. She began to have suicidal thoughts, felt socially isolated, and would wake up several times each night perspiring with her heart pounding. She considered attempting suicide in July 2002, took a knife from the kitchen to cut her veins, but put the knife back in the drawer because she thought her mother would suffer.
In 2005 defendant began to experience the signs of early pregnancy and her abdomen began to grow. Her father would touch her stomach, saying there was a baby there. She thought about running away, telling a friend, telling her mother, or going to a hospital, but she did not know how to get there and was afraid her parents would find out. On September 12, 2005, three days after her eighteenth birthday, she began having abdominal pain and stayed home from school, lying in bed all day. She knew she was about to deliver and was crying. Her father told her to calm down and not say anything. He told her she had to do the same thing as with the first baby.
At 5:00 a.m. the next morning, the pain got worse and she delivered the same way, although this time the baby started crying. Her father was knocking on the locked bathroom door, which he unlocked after the birth and entered the bathroom. Her father cut the umbilical cord and told defendant she had to do the same thing with this baby as the last one. She or her father took the baby from the toilet and she held her baby. Her father said, "You can't have that baby." She did not want to throw this second baby out the window, but her father kept saying she had to do it.
Her father pushed her to the window he had opened and told her to throw the baby out the window. Defendant put the baby on the windowsill and either the baby fell or she dropped him. Defendant was crying, but she could hear the baby crying all the way down and then continue to cry at the bottom of the air shaft. Her father yelled at her for not throwing the baby harder, and she said she was going down to pick him up. Her father grabbed her and said, "No." At that point, she felt dizzy because she was bleeding copiously. An hour or so later, the police arrived.
After her arrest, defendant was ordered on September 16, 2005, by the court to undergo a psychiatric examination to determine whether she was competent to stand trial and had the mental capacity to form the requisite mens rea for the crimes with which she had been charged. She was admitted to the Ann Klein Forensic Center on October 28, 2005, where she was evaluated and treated with Paxil for depression. On February 9, 2006, she was found competent to stand trial and was subsequently discharged to the Hudson County Jail on March 13, 2006, with a prescription for Paroxetine for her depression. *825 She subsequently entered her guilty pleas to second-degree aggravated assault and second-degree reckless manslaughter.

II.
In conducting a voir dire of defendant, the judge informed her that the offenses to which she was pleading carried prison terms of five to ten years and were subject to NERA, which would require defendant to serve eighty-five percent of any sentence imposed. He explained that he had discretion to sentence her to a term from five to seven years, which was the stipulated maximum in the plea agreement to which the State was free to speak.[3] He further explained that at the time of sentencing, the State could argue for seven years and her attorney could argue for one degree less, but that five years was the minimum sentence for a second-degree crime. Defendant expressed that she understood the sentencing ramifications of her pleas.
At her plea allocution, L.V. testified that her daughter was moving after her birth, which she had previously admitted. She testified that her father cut the umbilical cord and forcefully "told defendant to throw her daughter out the window." She did not comply and her father then threw the baby out the window. Defendant did not assist him, but she admitted she did nothing to protect her baby. Her father told her if she called the police, he would kill her mother. L.V. admitted throwing her son out the window, but stated her father ordered her to do so. She did not intend to injure her son, but knew he might be injured or die.
After the judge told defendant he would not accept her plea if she was not guilty, defendant consulted with her attorney and then testified she knew her father was going to throw her baby out the window, but she did not scream for help, call the police, or tell her mother, anyone at school, or anyone outside her family. She knew her baby might die, but remained silent for two years. Defendant did not waive any defenses as part of her plea bargain. Sentencing abided the preparation of a PSI report.
In the PSI report, the probation officer advised the judge defendant had difficulty reading and writing her native language and did not speak, read, or write English. The probation officer reported defendant said it was her father who threw the babies out the window, but defendant felt she was guilty because she did not report it. Defendant had been diagnosed with Post Traumatic Stress Disorder (PTSD) and Major Depressive Disorder, moderate to mild mental retardation, and performed at a first-grade level.
The probation officer requested that the judge
take into account the defendant was substantially influenced by an individual not only more mature than her but who also was an authority figure, which served as a strong provocation. Furthermore, the defendant's language barrier, cultural issues, having only resided in the United States since 2000 and cognitive limitations as well as the unlikeliness [sic] of such circumstance recurring be considered.
Attached to the PSI report were (1) a March 7, 2001, Confidential Psychological Evaluation prepared by Rosemary Barroso-Ramirez, School Psychologist with the West New York Public Schools Child *826 Study Team; (2) extensive records, evaluations, and Individualized Education Programs prepared by the West New York Public Schools at various times prior to defendant's arrest; (3) a Criminal Responsibility Report prepared for the court on February 10, 2006, by Elizabeth A. Hogan, M.D., from the Ann Klein Forensic Center, who is a Diplomat of the American Board of Psychiatry and Neurology with a certification in the subspecialty of forensic psychiatry; (4) a February 10, 2006, Competency to Stand Trial Evaluation prepared for the court by Dr. Hogan; (5) a Psychological Report prepared by Philip H. Witt, Ph.D. for defendant on March 8, 2006; (6) a Discharge Summary prepared on March 13, 2006, by Dr. Hogan relevant to defendant's October 28, 2005, admission to the Ann Klein Forensic Center; and (7) a March 15, 2006, Addendum to Criminal Responsibility Evaluation prepared for the court by Dr. Hogan. There were no reports prepared at the behest of the State that were included in the PSI report or in the record on appeal.
The author of the March 7, 2001, psychological evaluation concluded that defendant's IQ was fifty-seven and determined that she scored the age equivalent of less than five years, three months. After correcting for a small degree of error, the author of the report determined that defendant's true performance IQ was between forty-four and fifty-six. On other tests, defendant did "significantly poorer than her age peers." The author concluded that defendant was in the range of moderate mental retardation and that a program of special education should be considered for her.
Dr. Hogan reviewed extensive records, many of which are not in the record on appeal. She reported on February 10, 2006, that defendant, who was in the twelfth grade in high school, functioned at a first-grade level. Psychological testing done in February 2001 indicated defendant scored at an age equivalent of less than five years, three months. On June 1, 2004, she was evaluated as having a severe language disorder with severe deficits in comprehension and syntax. On intelligence testing done at the Ann Klein Forensic Center, defendant attained a quotient score of 72, which placed her with the third percentile rank. Dr. Hogan opined her true IQ score lies within the upper limits of mild mental retardation to the lower limits of the borderline range. Her abilities in math did not reach beyond the second-grade level. Dr. Hogan diagnosed her with PTSD, major depressive disorder, and mild mental retardation. Dr. Hogan medicated defendant for depression while she was at the Ann Klein Forensic Center.
Dr. Hogan opined that an insanity defense was not available to defendant because she understood the nature and quality of her act on September 13, 2006. "However, it is my opinion that the circumstances surrounding her behavior are so extreme and severe that they need to be considered when assessing her mental state at the time of the alleged offense" (emphasis added). Dr. Hogan continued:
[Defendant] was suffering from a mental illness at the time of her arrest.... The symptoms of her mental illness along with the severe trauma she was experiencing likely impaired her judgment and decision making ability at the time of the alleged offense. For years, [defendant] had been severely traumatized by her father. She was placed in fear for her life and for the life of her mother. She felt powerless towards her father and unable to stop the ongoing abuse. This fear and feeling of powerlessness likely affected her ability to remove herself from the abusive situation, inform others about her circumstances *827 or create an alternative plan for her pregnancy. She was told by her father that he would kill her if she told of the abuse or told of the pregnancy.
A second factor that should be considered about her mental state at the time of the alleged offense is that [defendant] reported that her father was present and forced her to drop her newborn infant out of the window. She stated that she was holding her baby, crying, and telling her father that she didn't want to do it. In addition to the normal control a parent has over a child, additional factors need to be considered when assessing [defendant's] mental state and her ability to resist her father's orders at the time of the alleged offense. Years of abuse, fear and powerlessness towards her father along with the mental illness she was suffering at the time likely influenced her vulnerability to be coerced by her father.
Thirdly, [defendant] suffers from cognitive limitations.... Her cognitive limitations likely impaired her judgment and ability to access medical, legal and mental health services and impaired her ability to create an alternative plan for her pregnancy.
A fourth factor to be considered is [defendant's] age. The alleged offense occurred four days after her eighteenth birthday. Although chronologically her age is eighteen, severe circumstances have impacted her development. She is mentally retarded. She has endured years of severe sexual and emotional abuse by her father. She has been socially isolated from normal peer interactions. She has suffered for years from symptoms of mental illness, including [PTSD] and Major Depressive Disorder. All of these factors contribute to her functioning both emotionally and cognitively at a developmental age less than the average eighteen year old.
Lastly, cultural issues need to be considered as well when assessing [defendant's] mental state at the time of the alleged offense. [Defendant] is a recent immigrant from El Salvador. She has experienced isolation within her community by both language and cultural barriers. In addition, since she has immigrated to this country, she has suffered ongoing trauma and forced isolation by her father. This has likely exaggerated cultural and language barriers and her assimilation into the community. Concern about the consequences to her family had she revealed the abuse or pregnancy was likely influenced by her family's recent immigration status. Cultural and language barriers likely affected [defendant's] ability to access medical, legal, and mental health services and likely impaired her ability to create an alternative plan for her pregnancy.
In summary, [defendant] was suffering from a mental illness at the time of the alleged offense. However, it is my opinion that her mental state at the time does not meet the statutory criteria for a finding of not guilty by reason of insanity. Nonetheless, there are severe circumstances that influenced her mental state at the time and likely impaired her judgment, behavior and decision making ability.
Dr. Hogan also opined, in light of the incarceration of defendant's father, that it was unlikely that defendant would again be in the same situation and, with continued psychiatric treatment, her then-current risk of dangerousness to others was low. Dr. Hogan recommended continued, long-term psychiatric treatment.
In an addendum to her February 9, 2006, report Dr. Hogan opined that defendant lacked the requisite state of mind *828 under N.J.S.A. 2C:4-2 to purposefully and knowingly commit aggravated assault with respect to the September 13, 2005, incident.
Dr. Witt interviewed defendant at the request of her counsel and found no evidence of a thought disorder or any signs of psychosis. He found a clear duress defense based on the following factors:
Her father's prior threats to kill her and her mother if she did not cooperate with him;
The long history of sexual abuse she experienced at the hands of her father (with resulting post-traumatic stress disorder);
The early age at which the sexual abuse of her began;
The fear that both her father's threats and the long history of his sexual abuse of her had caused;
Her youth and dependence upon her father for care and support;
Her father's presence in the bathroom when she dropped the first baby out the window;
Her father's specific instruction and insistence that she drop the first baby out the window;
Her father's instruction that she must do with the second baby what she did with the first one;
Her father's threats and physical coercion with regard to dropping the second baby out the window;
Her father's specific instruction and insistence that she not go to the basement to retrieve the second baby;
Her father's physically grabbing her to prevent her from rescuing the second baby.
Dr. Witt opined defendant's intellectual functioning was only within the lowest three percent of the population, and she had no abstract reasoning or problem-solving skills that would have enabled another individual to escape the abusive situation in which she was living. "Her cognitive impairments increased her level of dependency upon her parents and prevented her from examining options the way that an individual of higher intelligence would." He also opined that defendant "exhibits psychological disorders that further impaired her ability to reason at the time of the birth of her two children." Both the PTSD and Major Depressive Disorder pre-existed the birth of her first child and intensified thereafter. He concluded to "a reasonable degree of psychological certainty that [defendant] performed the acts that led to her present criminal charges under duress." With this background in mind, we turn to the sentence hearing.
On May 10, 2007, defendant appeared before the sentencing judge and sought to be sentenced either as an idiosyncratic or third-degree offender for purposes of a non-custodial or probationary sentence.[4] The judge, the State, and defendant all agreed that she was entitled to 604 days jail-time credit as of May 9, 2007. The judge stated he had read everything in the PSI, including Dr. Hogan's reports. Defendant elicited testimony from Dr. Hogan; Juan Santiago, a representative of the Developmentally Disabled Offender Program; and Saliume Walo, a representative of the New Jersey Coalition Against Sexual Abuse.
Because the judge had read Dr. Hogan's reports, defendant's counsel only elicited summary opinions from her on direct. Dr. Hogan testified defendant was in need of *829 long-term psychiatric treatment and expressed that defendant's history, in her experience, "was unique in the amount of abuse that she endured and the type of abuse." Dr. Hogan had never "come across other individuals with such a traumatic history and in such a controlled setting that [defendant] experienced." She testified that early treatment was important and expressed concern that proper treatment, given defendant's history, might not be available within the Department of Corrections.
On cross-examination, Dr. Hogan admitted that defendant was not psychotic and no longer had suicidal ideations when she last saw her. Although she knew that mental health treatment was available in prison, she reiterated her concern that the treatment there might not be appropriate for defendant's condition. On redirect examination, Dr. Hogan testified that defendant was in need of specialized treatment for victims of sexual abuse.
Santiago described the programs that would be available to defendant through the Developmentally Disabled Offender Program if she were placed on probation or after she was paroled. Walo, too, described the programs available to defendant through the New Jersey Coalition Against Sexual Abuse. Defendant's mother also spoke.
Defendant's counsel argued her two years of imprisonment paled by comparison to the "psychological dungeon" to which her father sentenced her when she was thirteen years old. He pointed to the effects of the constant rapes as described in the undisputed reports of Dr. Hogan and Dr. Witt. He argued defendant was an idiosyncratic offender under State v. Jarbath, 114 N.J. 394, 555 A.2d 559 (1989), and State v. Evers, 175 N.J. 355, 815 A.2d 432 (2003). He asserted defendant was compelled to harm her babiesshe did not want to do so, but rather was acting under duress that had been exerted since she was thirteen. He acknowledged there was always a general deterrence achieved by incarceration, but argued that had been achieved by the 604 days she already spent in jail. He pointed out that N.J.S.A. 2C:44-1d and -1f(2) permitted the judge to consider everything presented in the PSI report and at the hearing and that the presumption of incarceration had been overcome. Further, he urged defendant was more a victim than an offender and needed the services described by the witnesses at the hearing, including the State's expert, Dr. Hogan. As a result, he contended she should be sentenced to five years probation because the sentencing goals of the Code of Criminal Justice except rehabilitation had all been satisfied. He noted that even the Probation Department had not sought incarceration and had opined that the circumstances were unlikely to recur.
The prosecutor urged that defendant was not an idiosyncratic offender because she was not psychotic, not severely retarded, and did not kill her baby accidentally. He argued a manifest injustice excusing incarceration had only been found twice under the Code. The prosecutor also contended defendant would receive services in prison, making a probationary term unnecessary for her rehabilitation. He urged the judge to find aggravating factors (1), (2) and (9), conceding "a host of mitigating factors," and argued the sentencing factors were in equipoise. The prosecutor did not speak to any specific term of incarceration.
When imposing sentence, the judge found the following aggravating factors:
(1) The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner;

*830 (2) The gravity and seriousness of harm inflicted on the victim, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance;
. . . .
(9) The need for deterring the defendant and others from violating the law[.]
[N.J.S.A. 2C:44-1a.]
As to the first aggravating factor, the judge found defendant "knew exactly what [she] was doing, didn't report anything." He observed,
I understand there are issues there, I understand that you were traumatized, delayed stress syndrome, I understand the heartache you went through, but it happened repeatedly. You were living in our society, living in one of the towns, interacting with other people, and it happened again, and you do it again, and you're not evenand the only reason is just by happenstance, by fortune that the second child did not die. That's a course of continuing conduct.
The judge then addressed the second aggravating factor, conflating it somewhat with the first:
Serious nature of the offenses.... What you did was cruel, without any justification at all, and there are two children, one who will never see the light of day, and the other who will have great problems that at your hand caused these events.
I am stating this in terms of the totality of what occurred here. I'm not saying because one child died that you get a certain sentence, and the other one was assaulted you get a certain sentence. I'm saying combined I'm entitled to consider whether something happened in a particularly depraved way.
Finally, as to aggravating factor (9), the judge found:
But the need to deter both you and others is overwhelming. We cannot have a society where people unpunished, in effect, can have a child and toss them out the window, not once but twice. It cannot be tolerated, it won't be tolerated in this particular case. Sympathy has no place in our sentencing scheme, in our sentencing decisions.
The judge also found the following mitigating factors:
(7) The defendant has no history of prior delinquency or criminal activity...;
(8) The defendant's conduct was the result of circumstances unlikely to recur;
(9) The character and attitude of the defendant indicate that [s]he is unlikely to commit another offense;
(12) The willingness of the defendant to cooperate with law enforcement authorities;
(13) The conduct of a youthful defendant was substantially influenced by another person more mature than the defendant.
[N.J.S.A. 2C:44-1b.]
The judge did not explain why he did not find substantial grounds tending to excuse defendant's conduct although failing to establish a defense, mitigating factor (4).
The judge found that mitigating factor (9) was "very strong" and concluded that the aggravating and mitigating factors were in equipoise. He also found defendant was not entitled to be treated as an idiosyncratic defendant or as a third-degree offender. As to the first, although the judge acknowledged defendant was a sympathetic individual placed in a terrible *831 position and ruthlessly exploited by her father, he noted she was "in front of me as someone who has committed two atrocious acts against her own children." He continued,
there has been nothing that has come before me that would cause me to think that, other than the sympathy that naturally occurs as a result of the victimization you went through, that makes this situation so unique that you would be considered unique unto yourself and have under our case law all of those factors in your favor that would cause me to give you a probationary sentence when you're charged with not one, but two second degree crimes. So there's nothing that I can find that, in and of itself, makes you an individual that would not be sentenced to the normal course of aggravating and mitigating factors.
As to downgrading the offenses to third-degree, the judge observed that the presumption of imprisonment under N.J.S.A. 2C:44-1f(2) is overcome "only under exceptional circumstances, where the court explicitly finds, setting out its reasons for its conclusions, both that imprisonment would be a serious injustice, and that such an injustice overrides the need to deter others" and then only when the mitigating factors substantially outweigh the aggravating factors. He did not consider imprisonment as a third-degree offender.
With regard to the aggravating and mitigating factors, the judge stated "the reasons to justify any downgrading must be compelling. It can't be me just finding that there's more factors in your favor than there are against you, and say well, I'll give you probation, I'll downgrade it to one degree lower." He found that given the facts of this case, defendant did not overcome the presumption of imprisonment applicable to second-degree crimes. The judge concluded that the aggravating and mitigating factors were in equipoise, and sentenced defendant to the bottom of the range for second-degree offenses, five years incarceration with an eighty-five percent NERA parole disqualifier. This excessive-sentence appeal followed.
Defendant contends on appeal that the judge abused his discretion in sentencing her as a second-degree offender. She argues that her father had total control of her, her age-related intelligence was only six years old, and she suffered from PTSD. She asserts the aggravating and mitigating factors cannot possibly be in equipoise and the judge should also have found mitigating factor (4). Thus, defendant argues the mitigating factors substantially outweigh the aggravating factors and, under the scope of review discussed in Megargel, supra, 143 N.J. at 493-94, 673 A.2d 259, the judge abused his discretion in not sentencing her to one degree lower and a term of four years. Defendant also points out that the judgment of conviction incorrectly states that "aggravating factors completely and totally outweigh mitigating factors" whereas the record reflects that the judge found the factors were in equipoise.
The State responds that the judge commented there was nothing before him except sympathy that would cause him to think the situation was so unique that defendant should be considered as "unique unto herself" and "have under our case law all of those factors in [her] favor that would cause" him to give defendant a probationary term when she was charged with two second-degree crimes. Further, the State argues that it considered all of these factors in negotiating the plea.
Our role in reviewing a sentence imposed by a trial judge is limited. We only determine:

*832 (1) whether the exercise of discretion by the sentencing court was based upon findings of fact grounded in competent, reasonably credible evidence; (2) whether the sentencing court applied the correct legal principles in exercising its discretion; and (3) whether the application of the facts to the law was such a clear error of judgment that it shocks the conscience.
[Megargel, supra, 143 N.J. at 493, 673 A.2d 259 (citing State v. Roth, 95 N.J. 334, 363-365, 471 A.2d 370 (1984)).]
It is well settled that we "may not substitute [our] judgment for that of the trial court," State v. Johnson, 118 N.J. 10, 15, 570 A.2d 395 (1990), but may modify a defendant's sentence when we are convinced the sentencing judge was "clearly mistaken," State v. Jabbour, 118 N.J. 1, 6, 570 A.2d 391 (1990). We may not reach this conclusion unless "the facts of th[e] case make the sentence clearly unreasonable so as to shock the judicial conscience." Ibid. (quoting Roth, supra, 95 N.J. at 365, 471 A.2d 370); see also State v. Natale, 184 N.J. 458, 488-89, 878 A.2d 724 (2005) (same); Megargel, supra, 143 N.J. at 493, 673 A.2d 259 (same); State v. Pagan, 378 N.J.Super. 549, 558, 876 A.2d 812 (App.Div.2005) (same).
In sentencing, consideration of aggravating and mitigating factors must be part of the deliberative process, provided such factors are supported by credible evidence. State v. Dalziel, 182 N.J. 494, 505, 867 A.2d 1167 (2005); accord State v. Cassady, 198 N.J. 165, 180, 966 A.2d 473 (2009) (citing State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989)). Indeed, a trial judge "is required to consider all of the aggravating and mitigating factors and to find those supported by the evidence." Dalziel, supra, 182 N.J. at 505, 867 A.2d 1167 (emphasis added). Error by the trial court in determining the existence of any aggravating or mitigating factors will "nullif[y] the weight accorded to such factors and materially alter the calculus in the ensuing balancing of aggravating and mitigating factors." Jarbath, supra, 114 N.J. at 406, 555 A.2d 559.
Additionally, "the court must describe the balancing process leading to the sentence." State v. Kruse, 105 N.J. 354, 360, 521 A.2d 836 (1987) (citations omitted). "To provide an intelligible record for review, the trial court should identify the aggravating and mitigating factors, describe the balance of those factors, and explain how it determined defendant's sentence." Ibid. "Merely enumerating those factors does not provide any insight into the sentencing decision, which follows not from a quantitative, but from a qualitative, analysis." Id. at 363, 521 A.2d 836 (citing State v. Morgan, 196 N.J.Super. 1, 5, 481 A.2d 545 (App.Div.), certif. denied, 99 N.J. 175, 491 A.2d 682 (1984)).
When the judge has erred in applying N.J.S.A. 2C:44-1 to the facts in the record before him, or where no qualitative analysis of sentencing factors was placed on the record, we may remand for resentencing. Id. at 363, 521 A.2d 836. We may use our original jurisdiction under Rule 2:10-5 in conjunction with our review of sentences to determine whether aggravating and mitigating factors are based on sufficient evidence. Jarbath, supra, 114 N.J. at 410, 555 A.2d 559. We may exercise our original jurisdiction to impose a new sentence where no further fact-finding is required, State v. Kromphold, 162 N.J. 345, 355, 744 A.2d 640 (2000), although such exercise "`should not occur regularly or routinely,'" ibid. (citing Jarbath, supra, 114 N.J. at 410-11, 555 A.2d 559). "[T]his power [i]s to be used only sparingly: when trial courts are `clearly mistaken' and `the interests of justice demand intervention *833 and correction.'" Jarbath, supra, 114 N.J. at 410, 555 A.2d 559 (citation omitted).
Sentencing a first- or second-degree offender to a sentence one degree lower is governed by N.J.S.A. 2C:44-1f(2), which provides:
In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.
The statute thus establishes a two-step test. Megargel, supra, 143 N.J. at 495-96, 673 A.2d 259. "The court must be `clearly convinced that the mitigating factors substantially outweigh the aggravating ones and that the interest of justice demands a downgraded sentence.'" Id. at 496, 673 A.2d 259 (citing N.J.S.A. 2C:44-1f(2)). The Megargel Court observed that "the standard governing downgrading is high." Id. at 500, 673 A.2d 259. First, "a court must apply the basic sentencing principles of the Code." Ibid. Paramount is the requirement that the severity of the crime is "the most single important factor in the sentencing process." Ibid. (citing State v. Hodge, 95 N.J. 369, 379, 471 A.2d 389 (1984)).
In evaluating the severity of the crime, the trial court must consider the nature of and the relevant circumstances pertaining to the offense.... The surrounding circumstances of an offense may make it very similar to a lower degree offense, thus suggesting that a downgraded sentence may be appropriate.
[Id. at 500, 673 A.2d 259.]
Nonetheless, "facts personal to the defendant may be considered in the sentencing process." Id. at 501, 673 A.2d 259 (citing Jarbath, supra, 114 N.J. 394, 555 A.2d 559).
Courts should consider a defendant's role in the incident to determine the need to deter him from further crimes and the corresponding need to protect the public from him. Was the defendant the mastermind, a loyal follower, an accomplice whose shared intent is problematic, or an individual who is mentally incapable of forming the necessary criminal intent?
[Ibid.]
Deterrence is "one of the most important factors in sentencing." Ibid.
Then a sentencing judge must consider the interest of justice. A decision to downgrade "should be limited to those circumstances in which defendant can provide `compelling' reasons for the downgrade." Id. at 502, 673 A.2d 259 (citation omitted). Such "reasons must be in addition to, and separate from, the `mitigating factors which substantially outweigh the aggravating factors'" as found "under the first prong." Ibid. Finally, after identifying the sentencing factors, the judge must describe how, in the exercise of discretion, he balanced those factors. Ibid.
Accordingly, we review the judge's application of the basic sentencing principle of the Code to the facts contained in the record. Not all of his findings were based on "competent, reasonably credible evidence," id. at 493, 673 A.2d 259, and in some cases were contradicted by the record before him.
With respect to aggravating factor (1), the judge focused heavily on defendant's silence respecting both crimes. However, treating defendant's silence as an aggravating factor was utterly inconsistent with the opinions expressed by Dr. Hogan in *834 her reports to the court and those expressed by the defense expert, Dr. Witt. They both opined that defendant was powerless to resist her father, whom she feared; to extricate herself from the situation; or to seek help from anyone. They opined this paralysis was a result of the abuse she suffered at her father's hands, his threats to the life of defendant and her mother, defendant's cognitive limitations, chronological age, PTSD, and cultural and language barriers. This evidence was undisputed as the State never submitted an evaluation on its own behalf and the judge never rejected the opinions of Drs. Hogan and Witt as lacking in credibility. The record clearly does not support defendant's silence as a basis for aggravating factor (1). That is not to say that it was inappropriate to finding aggravating factor (1), but it does affect the weight to which this factor is entitled. The judge's finding of aggravating factor (2) is clearly supported by "competent, reasonably credible evidence in the record." Megargel, supra, 143 N.J. at 493, 673 A.2d 259.
As to aggravating factor (9), the judge's found there was an overwhelming need to deter defendant from "hav[ing] a child and toss[ing][it] out the window." However, this finding is inconsistent with everything in the PSI report. The probation officer asked the court to take into consideration that "defendant was substantially influenced by an individual not only more mature than her, but who also was an authority figure." Dr. Hogan's undisputed opinion was that it was unlikely defendant would ever find herself in the same situation again and was thus unlikely to reoffend. Thus, the record simply did not support a specific need to deter defendant and, in fact, the judge's finding in this respect was contradicted by his finding of mitigating factor (8)the defendant's conduct was the result of circumstances unlikely to recur. Of course, there is always a need for general deterrence, but the "very strong" weight the judge gave to this factor cannot be sustained when only general deterrence exists. Jarbath, supra, 114 N.J. at 405, 555 A.2d 559 ("[G]eneral deterrence unrelated to specific deterrence has relatively insignificant penal value.").
We find no error in the mitigating factors found by the judge, but the record also supported mitigating factor (4) (substantial grounds tending to excuse defendant's conduct, though failing to establish a defense). The judge did not explain why he did not find mitigating factor (4) in light of Dr. Witt's opinion that defendant had a viable duress defense under N.J.S.A. 2C:2-9a. That is, the defendant was coerced to engage in the conduct charged "by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist." Ibid. The record clearly and convincingly supports this mitigating factor by "competent, reasonably credible evidence in the record," Megargel, supra, 143 N.J. at 493, 673 A.2d 259, and it should have been found even if defendant had abandoned her duress defense. Defendant was not "the mastermind, a loyal follower, an accomplice, who's shared intent is problematic." Id. at 501, 673 A.2d 259.
Having concluded that the record supports aggravating factors (1), (2), and (9), and mitigating factors (4), (7), (8), (9), (12), and (13), we must weigh and balance these factors. Aggravating factor (1) is entitled to moderate weight, as is aggravating factor (2). However, aggravating factor (9) is entitled only to slight weight. Mitigating factor (4) is entitled to moderate weight, as are mitigating factors (7), (8), (9) and (12). Mitigating factor (13) is entitled to substantial weight in light of the influence *835 exerted by defendant's father, whom she had feared for years. Balancing the aggravating and mitigating factors, we are clearly convinced that the mitigating factors substantially outweigh the aggravating factors.
Does the interest of justice demand that defendant be sentence as a third-degree offender? We are clearly convinced that the high standard governing downgrading, Megargel, 143 N.J. at 500, 673 A.2d 259, is met here. Compelling reasons exist for the downgrade. Id. at 502, 673 A.2d 259. In addition to the mitigating factors, defendant is a person of very limited intelligence, functioning at a level in school initially below a five-year-old child and by the time of the crimes at the level of a six-year-old child. She struggled in school and was placed on special education programs. She has a severe language disorder and severe deficits in comprehension and syntax. She suffers from PTSD and Major Depressive Disorder. The circumstances surrounding her behavior were extreme and severe. She had been raped by her father repeatedly for years, causing impairment of her judgment and decision-making ability. She felt powerless toward her father and feared for her life and that of her mother. Her cognitive limitations impaired her ability to seek help with respect to the rapes and her pregnancies and affected her desire not to have her babies abused, and she was socially isolated by her abusive father. Her cultural and language barriers and her lack of assimilation into the community also prevented her from seeking help. As Dr. Hogan opined, "there are severe circumstances that influenced her mental state at the time and likely impaired her judgment, behavior and decision[-]making ability." Indeed, those circumstances were "horrific." The judge erred in refusing to sentence defendant as a third-degree offender.
We note defendant has been incarcerated for more than four years of her five-year sentences. As such, we are satisfied that it is appropriate to exercise our original jurisdiction to resentence defendant because a remand will work an injustice by continuing her incarceration further. We cannot give defendant a non-custodial sentence because the crimes to which she pled guilty are subject to NERA, which applies despite sentencing defendant as a third-degree offender. See State v. Johnson, 376 N.J.Super. 163, 168, 869 A.2d 473 (App.Div.2005) (NERA applies despite downgraded sentence where crime was a first- or second-degree violent crime); State v. Cheung, 328 N.J.Super. 368, 371, 746 A.2d 38 (App.Div.2000) (although sentenced one degree lower, NERA still applies to the lower sentence because the crime to which defendant pled triggered application of NERA). Accordingly, we sentence defendant to two concurrent four-year terms of incarceration, the mid-range sentence for third-degree crimes, N.J.S.A. 2C:43-6(3), with credit for time served, of which eighty-five percent must be served pursuant to NERA with a three-year period of parole supervision upon release. Because defendant has served the maximum sentence imposed, she shall be released forthwith. While defendant is on parole, the Department of Corrections shall coordinate the provision of services to defendant that are available in the community for victims of sexual abuse, such as those available through the New Jersey Coalition Against Sexual Abuse.
Reversed and remanded for entry of an amended Judgment of Conviction.
NOTES
[1] Judge Stern did not participate in oral argument. However, the parties consented to his participation in the decision.
[2] L.V. consented to a waiver of juvenile court proceedings on March 28, 2006, and the matter was transferred to the Law Division.
[3] The State had agreed to recommend concurrent sentences as consideration for defendant's testimony against her father.
[4] By the time of this sentencing hearing, defendant's father had been tried, found guilty, and sentenced to thirty-five years in prison, subject to an eighty-five percent NERA parole disqualifier.