**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5473-17

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JOSEPH S. MACCHIA,

      Defendant-Appellant.

_____

> Argued November 16, 2020 – Decided October 4, 2021
>
> Before Judges Currier, Gooden Brown and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-12-0814.
>
> John Vincent Saykanic argued the cause for appellant.
>
> Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Michele C. Buckley, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a jury trial, defendant was convicted of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), and sentenced to a six-year term of imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The charge stemmed from the fatal shooting of Michael Gaffney outside a bar. Defendant, then an off-duty police officer, and the victim engaged in fist fights during the night, which ended when defendant fired his service weapon, hitting the victim three times. At trial, the State presented a surveillance video of the encounter as well as the accounts of multiple eyewitnesses. Defendant claimed he shot the victim in self-defense because the victim was reaching for defendant's gun.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT'S ADMITTEDLY ERRONEOUS INSTRUCTION AS TO WHAT THE JURY WAS REQUIRED TO FIND IN ORDER TO DISALLOW SELF-DEFENSE (THE COURT'S INCORRECTLY REQUIRING THAT DEFENDANT "DID NOT PROVOKE THE ENCOUNTER WITH THE PURPOSE TO KILL" AS OPPOSED TO THE CORRECT "DID NOT PROVOKE THE USE OF FORCE AGAINST HIMSELF IN THE ENCOUNTER WITH THE PURPOSE TO KILL") DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL (U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARA. 9).

POINT II

THE TRIAL COURT ERRED IN ITS INSTRUCTION BY NOT SPECIFICALLY INSTRUCTING THE JURY THAT IT NEEDED TO UNANIMOUSLY AGREE ON THE FACTORS DISPROVED BY THE STATE BEYOND A REASONABLE DOUBT (IN SPITE OF THE DEFENSE REQUEST AND OBVIOUS JURY CONFUSION), AND FAILED TO PROVIDE THE JURY WITH A SPECIAL INTERROGATORY REGARDING THE THEORY FORMING THE BASIS FOR ITS CONVICTION RESULTING IN AN UNCONSTITUTIONAL PATCHWORK/FRAGMENTED OR LESS THAN UNANIMOUS VERDICT (U.S. CONST. [AMENDS.] V, VI, XIV; N.J. CONST. (1947) ART. I, PARA. 9); AND R[ULE] 1:8-9.

POINT III

THE ERRONEOUS JURY INSTRUCTION AS TO THE TIMING WITH REGARDS TO THE DUTY TO RETREAT "AFTER THE SECOND ALTERCATION" WHEN, IN REALITY, IT WAS AT THE MOMENT OF THE USE OF DEADLY FORCE, DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL (U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARA. 9).

POINT IV

THE TRIAL COURT DENIED DEFENDANT OF HIS SIXTH AMENDMENT RIGHT OF CONFRONTATION TO FULLY CROSS-EXAMINE A KEY STATE'S WITNESS[] (U.S. CONST. AMEND. VI; N.J. CONST. (1947) ART. I, PARA. 10).

3

POINT V

THE IMPROPER STATE'S CLOSING STATEMENT (INCLUDING AN IMPROPERLY UTILIZED POWER POINT PRESENTATION MIS[S]TATING THE LAW AS TO DUTY TO RETREAT) DEPRIVED DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL (U.S. CONST. AMENDS. VI, XIV; N.J. CONST. (1947) ART. I, PARAS. 1, 10).

POINT VI

THE TRIAL COURT ERRED IN ADMITTING MANY HIGHLY PREJUDICIAL HEARSAY STATEMENTS OF GAFFNEY THROUGH THE TRIAL TESTIMONY OF ROBERT LIMA AS PRESENT SENSE IMPRESSIONS UNDER [N.J.R.E.] 803(C)(3) AND UNDER [N.J.R.E.] 803(C)(2); THE GAFFNEY/LIMA STATEMENTS SHOULD ALSO HAVE BEEN RULED INADMISSIBLE UNDER [N.J.R.E.] 403; DEFENDANT'S CONFRONTATION AND DUE PROCESS RIGHTS WERE VIOLATED (U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARA. 10).

POINT VII

THE TRIAL COURT COMMITTED PLAIN ERROR (R. 2:10-2) IN FAILING TO ADDRESS TO THE JURY (EITHER WITH A LIMITING INSTRUCTION DURING THE TESTIMONY OF LIMA OR DURING FINAL JURY INSTRUCTIONS) THE LIMITED PURPOSE OF THE "PRESENT SENSE/STATE-OF-MIND" HEARSAY EVIDENCE (NOT RAISED BELOW).

POINT VIII

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL AS THE STATE DID NOT PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT; THE DEFENDANT'S CONVICTION IS CONTRARY TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND [THE] NEW JERSEY STATE CONSTITUTION (1947) ART. I, PARAS. 1, 10.

POINT IX

THE NUMEROUS LEGAL ERRORS COMMITTED BY THE COURT DEPRIVED DEFENDANT OF HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND NEW JERSEY CONSTITUTIONAL RIGHT TO A FAIR TRIAL; (U.S. CONST. AMENDS. VI AND XIV; N.J. CONST. (1947) ART. I, PAR. 10) (NOT RAISED BELOW).

POINT X

AS THE SENTENCING JUDGE FOUND THAT THE MITIGATING FACTORS SUBSTANTIALLY OUTWEIGHED THE ONE AGGRAVATING FACTOR, THE DEFENDANT SHOULD HAVE BEEN SENTENCED TO A SENTENCE ONE DEGREE LOWER PURSUANT TO [N.J.S.A.] 2C:44-1[(F)](2) AND SENTENCED TO THE MINIMUM TERM PERMISSIBLE.

We have considered these arguments in light of the record and applicable legal principles. We reject each of the points raised and affirm.

A-5473-17

I.

Following the adjudication of various pre-trial motions, an eleven-day jury trial was conducted on various dates in May and June 2018, during which the State produced seventeen witnesses. In addition to the medical examiner and various law enforcement witnesses, the bar owner, the bartender, and seven bar patrons testified for the State, including defendant's wife. Defendant testified on his own behalf. He did not present any additional witnesses. We glean these facts from the trial record.

Defendant was an eleven-year veteran police officer with the Newark Police Department. Upon completion of his shift on May 12, 2016, defendant returned to his home, changed into his civilian clothes, and secured his service weapon on his waist in an off-duty holster, covering it with "an oversized tee shirt." Thereafter, defendant and his wife, Katherine Macchia, went to Paddy's Place, a bar located in Union to celebrate Katherine's newly discovered pregnancy.[1] They arrived at about 11:00 p.m., socialized and listened to music. Several of the patrons, including defendant and his wife, were regular customers

---

[1] The parties stipulated that "Newark Police Department rules and regulations give off-duty police officers the option of being armed with their service weapons when they engage in activity that includes the consumption of alcoholic beverages."

who knew each other. Over the course of about two hours, defendant consumed "[six] Miller Lite beers and [two] shots . . . of Jack Daniels" while his wife drank "[s]eltzer water."

Michael Gaffney, with whom defendant was acquainted, arrived at Paddy's Place around 10:30 p.m. to meet his friend, Robert Lima, to discuss a potential construction job. Gaffney and Lima both worked in the construction industry and had known each other for about twenty years. Lima arrived at the bar between 10:00 p.m. and 10:30 p.m. and consumed "[a]bout two [drinks]." Shortly after 1:00 a.m. the following morning, Lima was in the process of leaving when "he saw Gaffney had a cigarette in his mouth." While outside, Lima and Gaffney playfully jostled each other over the cigarette Gaffney was smoking, prompting Gaffney to "joking[ly]" hit Lima's shoulder. According to Gregory Netschert, another bar patron and friend of Gaffney and Lima, Gaffney was known among his friends for "play fight[ing]" and had "punched [Netschert] in the chest" as he was leaving the bar.

Around that time, defendant was also outside smoking a cigarette. When defendant saw Gaffney hit Lima, he asked Gaffney if he "liked to throw hands" and Gaffney responded "sometimes." Gaffney and defendant then began "slap boxing" with each other, which Lima described as "the two . . . squar[ing] with

7

each other and hit[ting] each other" without "try[ing] to be malicious." By all accounts, Gaffney was significantly taller and heavier than defendant.[2] At one point, Gaffney hit defendant and defendant "went down." Gaffney then tackled defendant, and the two wrestled on the ground. Lima tried unsuccessfully to separate them. At some point, defendant grabbed Gaffney by the shirt and pulled the shirt off of him. By that time, other patrons, and the bartender, Nicolette Bedlivy, had exited the bar and tried to convince defendant and Gaffney to stop fighting. Eventually, they were separated, and Gaffney walked back inside the bar while defendant remained outside with his wife, who was pleading with him to leave. However, defendant was visibly agitated. One bar patron, Anthony DiMondi, approached defendant and tried to get him to calm down, telling him he didn't "want to ruin [his] career." Defendant did not respond.

Meanwhile, Gaffney was inside the bar with his friend and former Paddy's Place bartender, Catherine Vinsko. Vinsko told Gaffney to stop fighting because defendant would "sue him if he kept it up." Gaffney finally agreed and walked back to the front door. Standing in the doorway, Gaffney said to defendant: "Bro, it's over." "I don't want to fight." "Just let's end it." Witnesses

---

[2]  According to defendant, Gaffney was "six[-foot] three, six[-foot] four, 260, 270 pounds" and he was "five[-foot] seven, 195 pounds."

testified that at that juncture, Gaffney and defendant "shook hands" and "chest bumped" each other to signify a reconciliation. Gaffney then walked back inside the bar. On the other hand, defendant stayed outside, saying he was "not done." Although his wife tried to get him to leave, defendant refused. Instead, defendant stood by the doorway of the bar, looking and pointing at Gaffney "to entice him to come back out." In response, Gaffney yelled "stop eyeballing me."

Eventually, Gaffney came to the door, and he and defendant began to fight again. Defendant fell to the ground, and Gaffney got on top of him, punching him repeatedly. Realizing the fight was not going to stop, Lima went over to Gaffney and grabbed him. Vinsko also tried to grab Gaffney. As they pulled him off of defendant, defendant shot Gaffney, striking Gaffney in the chest, shoulder, and abdomen. Gaffney fell on top of defendant and died shortly thereafter. Vinsko went back inside the bar and "hit the panic button . . . under the register," prompting the Union Police Department to respond.

When Union police officers responded to the scene, defendant said he was "a Newark police officer and [Gaffney] was going for [his] gun." The officers promptly disarmed and arrested defendant. The officers then approached Gaffney, who was "non-responsive." When the medical examiner arrived at the scene, he took control of Gaffney's body.

9

After his arrest, defendant was placed in the back of Officer Christopher Connors's patrol vehicle. Because defendant would not stop talking, Connors read defendant his Miranda[3] rights. Defendant's statements were recorded on the vehicle's dashboard camera and played for the jury during the trial. In the recording, defendant said he "almost passed out" and Gaffney "fucked [him] up." Defendant stated: "It happened, then it stopped and then he came out again." Defendant repeated that he was a Newark police officer, and that Gaffney was going for his gun.

Officer Rahmel Spann and his partner were responsible for transporting defendant to the hospital to treat his injuries. While they were in the waiting room, defendant asked about Gaffney's condition and "showed remorse." He also asked Spann what he would do if he were "in that situation." Defendant stated Gaffney "knew [he] was a cop," and reiterated that he thought Gaffney was "going for [his] gun." Further, defendant told Spann "[he] defecated on himself" and "felt like he was going to black out." Defendant was discharged from the hospital with a "head injury, broken nose . . . abrasions to . . . both knees," and "a sprained left wrist."

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

When Bedlivy spoke to officers at the scene, her statements were recorded on the dashboard camera and played for the jury during the trial. In the recording and during her trial testimony, Bedlivy said Gaffney "tried to grab [defendant's] gun." However, at trial, she acknowledged she did not see Gaffney reach for defendant's gun, and the reason she initially said she did was because defendant's wife "told [her] that's what" occurred. Defendant's wife confirmed during her trial testimony that "it was [her] perception" that Gaffney reached for her husband's gun. Lima, on the other hand, testified at trial that he did not see Gaffney reach for defendant's gun.

One week after the incident, defendant was interviewed at the Union County Prosecutor's Office. He was accompanied by his attorney and was administered his <u>Miranda</u> rights. The recorded interview was played for the jury at trial. In his statement, defendant explained the altercation began when Gaffney approached him while he was outside smoking a cigarette and asked him if he "wanted to fight."[4] Given the size difference, defendant responded "no." Nevertheless, Gaffney punched him "in the chest" and tackled him to the ground. While they were wrestling on the ground, "the fight was broken up,"

---

[4] Defendant suggested Gaffney's solicitation to fight may have been prompted by defendant intervening earlier in Gaffney's attempt to fight another bar patron who was much smaller and older than Gaffney.

and the two "shook hands." Thereafter, when defendant stood outside the bar door to get "somebody's attention" to "get [his] jacket" and "settle [his] tab," Gaffney asked defendant if he was "eyeballing" him and started fighting again despite defendant's response that he was not "eyeballing" him. During the second fight, while Gaffney was "straddling [him]," and "pummeling [him] on the ground . . . both [Gaffney's] hands . . . went to [his] duty weapon." Defendant said he was "in fear of [his] life and [his] wife's life so [he] had no choice but to fire to stop the threat." According to defendant, he "fired three . . . shots consecutively."[5]

Surveillance video was recovered from Paddy's Place by Union County Prosecutor's Office Detective Darius Tokarz. The video was played for the jury and referred to by the witnesses multiple times during the trial.

Dr. Junaid Shaikh, the medical examiner who performed Gaffney's autopsy, testified Gaffney "sustained three gunshot wounds, one to the left side of the chest, one to the left upper shoulder, and one to the right upper aspect of the abdomen." The gunshot wound to the chest was the fatal wound. Based on the stippling of gun powder residue observed around each bullet entry wound,

---

[5] During the trial, defendant's grand jury testimony was read to the jury. The grand jury testimony was largely consistent with his recorded statement.

Shaikh believed the gun was fired approximately seven to eight inches from the skin. Additionally, Shaikh testified Gaffney had injuries to his face, including bruising just above his left eyebrow and lip, superficial injuries to his nose, a laceration to his upper lip, and swelling under his left eye. Gaffney also had injuries to his right knee and right front thigh. According to Shaikh, those injuries were consistent with a "scuffle or physical altercation."[6]

At trial, defendant testified on his own behalf consistent with his recorded statement. He insisted he had done nothing to entice or encourage Gaffney to fight him. Although Gaffney punched him and broke his nose, causing him to bleed "profusely," defendant said he did nothing to fight back. Instead, defendant testified he tried to "hug[] him like a boxer would" to try to get him to "stop," but Gaffney kept punching him. Defendant said he eventually fell to the ground, causing his shirt to ride up and expose his gun. He put his hand on his gun to "retain it in the holster" while Gaffney held him down with his right

---

[6] "Toxicology by the Medical Examiner's Office indicated . . . Gaffney's BAC [blood alcohol content] was .30% at 1:16 a.m., the time of his death," and "also indicated . . . Gaffney had consumed cocaine." Defendant's BAC was "estimated to have been approximately .13%, at 1:16 a.m."

13

arm and punched him in his face with his left fist.[7]  Defendant said Gaffney then went towards defendant's "right side . . . towards [his] duty weapon."  At that moment, defendant decided to "draw and shoot" to stop Gaffney from obtaining his gun.  Defendant testified he was "quite certain [he] was going to die."

Defendant's motion for judgment of acquittal at the close of the State's case pursuant to Rule 3:18-1, was denied.[8]  Following the jury's guilty verdict, defendant was sentenced on July 27, 2018, and a memorializing judgment of conviction was entered on the same date.  This appeal followed.

II.

In Point I, defendant argues the judge incorrectly instructed the jury on self-defense.  Specifically, defendant contends that in his initial charge to the jury, the judge left out "the crucial words: 'did not provoke the use of force against himself in the encounter.'"  Although defendant acknowledges the judge "corrected" the error when he reinstructed the jury, he argues the judge "created

_____

[7] Defendant testified he viewed Gaffney "punch[ing him] repeatedly about [his] head and [his] head hitting the concrete" as "deadly force" being used against him.

[8] After the motion was adjudicated, the State moved to reopen its case to call an additional witness, which was granted.

14

an incurable and insurmountable obstacle to the jury's clear understanding," as a result of which his conviction should be reversed. We disagree.

In the initial charge on self-defense, the judge instructed the jury, in pertinent part:

> To put it succinctly, if the defendant had an honest and reasonable belief that the use of deadly force was immediately necessary to save his own life or to avoid serious bodily harm, <u>he did not provoke the encounter</u> with the purpose to kill or cause serious bodily harm, and he could not have safely retreated, then self-defense applies and the defendant is not guilty.
>
> [Emphasis added.]

There was no objection to the charge.

Following the charge, the jury sent out several notes regarding the self-defense charge. Consequently, the parties agreed although "there was no error in the jury charge that was given," a revised instruction was necessary to provide clarification. In the revised instruction that was agreed to by both parties, the judge stated in part:

> To put it succinctly, if the defendant had an honest and reasonable belief that the use of deadly force was immediately necessary to save his own life or to avoid serious bodily harm, <u>he did not provoke the use of force against himself in the encounter</u> with the purpose to kill or cause serious bodily harm and he could not have safely retreated when he resorted to the use of deadly

15

force, then self-defense applies and the defendant is not guilty.

[Emphasis added.]

Because defendant did not object to the jury charge, we review for plain error and only reverse if the error was "clearly capable of producing an unjust result." State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2).

> In the context of jury instructions, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Camacho, 218 N.J. 533, 554 (2014) (quoting State v. Adams, 194 N.J. 186, 207 (2008)).]

"Defendant is required to challenge instructions at the time of trial." State v. Morais, 359 N.J. Super. 123, 134 (App. Div. 2003) (citing R. 1:7-2). "Where there is a failure to object, it may be presumed that the instructions were adequate." Id. at 134-35 (citing State v. Macon, 57 N.J. 325, 333 (1971)). "The absence of an objection to a charge is also indicative that trial counsel perceived no prejudice would result." Id. at 135. "Consequently, we should only reverse if we find plain error." Ibid. (citing R. 2:10-2).

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. Afanador, 151 N.J. 41, 54 (1997).

16

"Appropriate and proper jury instructions are essential to a fair trial." State v. Green, 86 N.J. 281, 287 (1981). "The [trial] judge 'should explain to the jury in an understandable fashion its function in relation to the legal issues involved.'" McKinney, 223 N.J. at 495 (quoting Green, 86 N.J. at 287). "The trial judge must deliver 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" Ibid. (quoting Green, 86 N.J. at 287-88).

When reviewing an alleged error in the jury charge, "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect," State v. Wilbely, 63 N.J. 420, 422 (1973), and "to determine whether the challenged language was misleading or ambiguous," State v. Nelson, 173 N.J. 417, 447 (2002). In "assessing the soundness of a jury instruction," a reviewing court considers how ordinary jurors would "understand the instructions as a whole," based upon "the evidence before them, and the circumstances of the trial." State v. Savage, 172 N.J. 374, 387 (2002) (quoting Crego v. Carp, 295 N.J. Super. 565, 573 (App. Div. 1996)).

Moreover, the effect of any error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting

17

State v. Chapland, 187 N.J. 275, 289 (2006)).  "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'"  Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

Here, the language defendant asserts was missing from the initial charge was included in the revised instruction.  In fact, it was also included in the initial charge in the paragraph preceding the objectionable language as follows:

> [D]eadly force is not justifiable in a situation where the actor with the purpose of causing death or serious bodily harm provoked the use of force against himself in the same encounter . . . .  Nor is the use of deadly force justifiable where the actor knows that he can avoid the necessity of using such force with complete safety by retreating.

Even if there was confusion, which we are satisfied there was not, any confusion was clarified by the judge's revised instruction.  Reviewing the charge as a whole, we find no plain error in the self-defense charge.

## III.

In Point II, defendant argues the judge erred in failing to include a specific unanimity charge as part of the self-defense charge.  Defendant claims there was "obvious jury confusion" regarding self-defense, which the judge failed to

clarify. According to defendant, the "instructions were 'at best confusing, and at worst misleading,'" warranting reversal of his conviction.

In the initial self-defense charge to the jury, the judge stated:

> Under the law, the State must prove that self-defense does not apply here. The State must do so beyond a reasonable doubt. Accordingly[,] the State must show that: 1) the defendant's belief that the use of deadly force was necessary to save his own life or to avoid serious bodily harm was not honest and reasonable; or 2) although the defendant's belief was honest and reasonable, the defendant provoked the encounter with the purpose to kill or cause serious bodily harm; or 3) although the defendant's belief was honest and reasonable and the defendant did not provoke the encounter with the purpose to kill or cause serious bodily harm, the defendant could have retreated in complete safety.
>
> Here[,] there is no dispute that the defendant used deadly force against Mr. Gaffney.
>
> A reasonable belief is one which would be held by a person of ordinary prudence and intelligence situated as this defendant was. Please note that self-defense exonerates a person who uses force in the reasonable belief that such action was immediately necessary to prevent his or her death or serious injury, even if his belief was later proven mistaken. Accordingly, the law requires only a reasonable, not necessarily a correct, judgment. The belief must be sincerely held, that is, it must be a belief that is honestly held at the time.
>
> ln your inquiry as to whether the defendant knew that an opportunity to retreat with complete safety was

19

available, the total circumstances including the attendant excitement accompanying the situation must be considered. You must consider the defendant's ability to retreat at the time that the defendant decided to use deadly force.

If the State does not satisfy its burden and you do have a reasonable doubt, then it must be resolved in favor of the defendant and you must acquit the defendant based upon self-defense.

If the State has proved any one of these three items beyond a reasonable doubt, then the defendant did not act in self-defense and you must go on to consider the crime of reckless manslaughter.

After the initial charge, the jury sent out a note asking the "judge [to] go over self-defense as stated on page [seventeen]." The jury was provided with a written copy of the jury charge. Page seventeen of the charge contained the language quoted above. However, because the parties were unclear about the request, the judge asked the jury for clarification. The jury then sent out a second note stating "[d]o all three questions have to be yes for self-defense or one of the three to be self-defense?"

After conferring with counsel, the judge responded:

Based on your prior question I know you're referring to the three questions that appear on page [seventeen] of [twenty-two] in the jury charge. Here is the response and I think there may be some confusion among you because the State has to disprove self-defense beyond a reasonable doubt. And when you're talking about

20

things being proved and things being disproved, sometimes it's hard to understand what "yes" means and what "no" means so I'll try to clarify that.

Talking about the items one, two and three . . . on page [seventeen] of [twenty-two] of the jury charge, the State must prove one or two or three beyond a reasonable doubt in order to disprove self-defense. Said differently, if the State proves one or two or three beyond a reasonable doubt, then there can be no self-defense.

Before the end of the day, at the request of the parties, the judge provided the jurors with further clarification on the self-defense charge as follows:

Ladies and gentlemen, before I send you home for the day, I do want to provide you with some additional clarification with regard to the applicability of [one], [two], and [three], the meaning of those rules of law in the context of your determination.

I'm referring to page [seventeen] of the charge. With regard to Item N[umber] [One] which addresses the defendant's belief that the use of deadly force was necessary to save his own life or to avoid serious bodily harm being honest or reasonable -- excuse me -- honest and reasonable, you're to analyze that question as of the time the deadly force was used. However, you are free to consider all the facts and circumstances in evidence that led up to that moment in time in performing that analysis.

With regard to number [two], the provocation issue, whether or not the defendant provoked the encounter with the purpose to kill or cause serious bodily harm. It will be up to you to determine when the

21

encounter began, but it must be some time after the reconciliation that you've heard about in the testimony.

With regard to item [three], which is the duty to retreat, the duty to retreat applies when the defendant resorts to the use of deadly force. So[,] when you're considering the opportunity to retreat, it must be as of the time deadly force is used. So[,] there's a little bit of a different time period depending upon which question you're looking to and I want to make sure there's no confusion that it is not all exactly the very same time period potentially.

Both parties agreed the judge's clarification was responsive and appropriate.

On the next court day, the parties again discussed the self-defense charge:

[COURT]: So[,] we've had some discussions concerning the jury's questions that were sent to the [c]ourt, and I think we've reached a resolution of the issue, but I want to go over a couple things with counsel first.

First of all, I believe that the parties agree that there was no error in the jury charge that was given to the jurors. Is that correct, [Prosecutor]?

[PROSECUTOR]: Yes. Thank you.

[COURT]: [Defense counsel]?

[DEFENSE COUNSEL]: That is correct.

[COURT]: Now due to the jury's request for clarification of certain issues, the parties agree that it is prudent to provide them with a revised charge on self-defense . . . . The parties have reviewed the revised

22

charge . . . and consent to it.  Do I have that correct, [Prosecutor]?

[PROSECUTOR]: Yes.  Thank you.

[COURT]: [Defense counsel]?

[DEFENSE COUNSEL]: Yes.

In the revised charge, the judge instructed the jury:

Now we're getting to the point in the self-defense charge that's modified to address your questions.

The State must prove that self-defense does not apply here.  The State must do so beyond a reasonable doubt.  Accordingly, the State must prove any one of the following beyond a reasonable doubt to show that self-defense does not apply here: 1) At the time defendant resorted to deadly force his belief that the use of deadly force was necessary to save his own life or to avoid serious bodily harm was not honest and reasonable; or 2) After the reconciliation between defendant and Mr. Gaffney, the defendant provoked the use of deadly force against himself in the encounter with the purpose to kill or cause serious bodily harm. It is for the jury to decide what the encounter was and when the encounter began after the reconciliation between defendant and Mr. Gaffney; or 3) At the time he resorted to deadly force the defendant could have retreated in complete safety.

Here, there is no dispute that the defendant used deadly force against Mr. Gaffney.

. . . .

23

If the State does not satisfy its burden and you do have a reasonable doubt, then it must be resolved in favor of the defendant and you must acquit the defendant based upon self-defense.

If the State has proved any one of these three items beyond a reasonable doubt, then the defendant did not act in self-defense and you must go on to consider the crime of reckless manslaughter.

There was no objection to the revised charge.

Later that day, the jury sent another note, stating "[j]ury cannot come to unanimous decision on question one on the verdict sheet."[9] After discussing the note with counsel, the judge — with counsels' approval — instructed the jury to continue deliberations as it had "not spent any significant amount of time deliberating" given the "interruptions for breaks and video readbacks and testimony readbacks." The judge, without objection, also repeated the portion of the general charge relating to the jurors' obligation "to consult with one another" and "deliberate with a view to reaching an agreement if you can do so

---

[9] Question one on the verdict sheet read:

Did the State disprove, beyond a reasonable doubt, the applicability of self-defense? If your answer is yes, proceed to question two. If your answer is no, then you have found the defendant not guilty due to self-defense. Stop your deliberations and notify the Sheriff's Officer, but do not reveal your results.

A-5473-17

without violence to individual judgment." The judge also reminded the jurors to "not surrender [their] honest conviction[s] as to the weight or effect of evidence . . . solely because of the opinion of [a] fellow juror[] or for the mere purpose of returning a verdict." The jury did not reach a verdict that day.

On the next court day, the judge addressed an e-mail he received from defense counsel suggesting, in response to the jury's note regarding its inability to reach a verdict on question one, the court should instruct the jury that its decision must be unanimous as to whether the State met its burden to disprove self-defense under prong one, two, or three of the self-defense charge. In other words, according to defense counsel, all jurors had to agree the State proved, for example, defendant could have retreated for the State to meet its burden. If six jurors believed defendant could have retreated, and six jurors believed defendant provoked the victim, then the State did not meet its burden. The judge responded that the issue raised in defense counsel's e-mail was premature considering the jury's continued deliberations without additional questions.

Later that day, the jury sent another note, asking for, among other things, "more clarification on justification, self-defense, page [seventeen] . . . where self-defense does not apply here. Number one, number [two], and number

25

[three] in plain English."  In response, with the consent of the parties, the judge instructed the jury:

> 1.   You have heard the defendant say that he used deadly force because at the time he used deadly force he believed that it was necessary to save his own life or to avoid serious bodily harm to himself.
>
> The State must prove beyond a reasonable doubt that defendant's expressed belief was not honest or that it was not reasonable.  If the State proves this beyond a reasonable doubt, then there is no self-defense.
>
> 2.   Another way self-defense could be disproven is by the State proving beyond a reasonable doubt that after defendant and Mr. Gaffney shook hands outside of Paddy's Place, defendant with the purpose to kill or cause serious bodily harm to Mr. Gaffney provoked the use of force against himself.
>
> If the State proves this beyond a reasonable doubt, then there can be no self-defense.
>
> [3.]  Another way self-defense could be disproven is by the State proving beyond a reasonable doubt that at the time defendant used deadly force defendant could have retreated in complete safety.  If the State proves this beyond a reasonable doubt, then there can be no self-defense.
>
> . . . .
>
> If the State has proved any one of these three items beyond a reasonable doubt, then the defendant did not act in self-defense and you must go on to consider the crime of reckless manslaughter.

26

If the State does not satisfy its burden and you do have a reasonable doubt, then it must be resolved in favor of the defendant and you must acquit the defendant based upon self-defense.

Following this instruction, the judge asked if the parties had any issues with what he read. Defense counsel requested that the judge instruct the jury, "if the State has not proved any one of these three items beyond a reasonable doubt, then the State does not satisf[y] its burden." The judge responded:

I understand your position. I'm looking at what you propose compared to the words that I read. I find it to be a distinction without a difference and I don't find that the clarification is necessary . . . . I'm not going to give the clarification that you seek because I think it's clear. I think the burdens are appropriately identified . . . and the jury was properly instructed.

The jury did not ask any further questions regarding the self-defense charge.

On appeal, defendant argues the judge should have instructed the jury "that it needed to unanimously agree on the factors disproved by the State beyond a reasonable doubt."

"The notion of unanimity requires 'jurors to be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." State v. Frisby, 174 N.J. 583, 596 (2002) (quoting United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1997)); see also Ramos v. Louisiana, 590 U.S. ___, ___, 140 S. Ct. 1390, 1396-97 (2020) (recognizing "a defendant 'enjoys a

27

constitutional right to demand that his liberty should not be taken from him except by the joint action of the court and the unanimous verdict of a jury of twelve persons'" (quoting Thompson v. Utah, 170 U.S. 343, 351 (1898))). Indeed, both the New Jersey Constitution and Court Rules require a unanimous jury verdict in a criminal case. N.J. Const. art. I, para. 9; R. 1:8-9.

"Ordinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict." State v. Parker, 124 N.J. 628, 641 (1991). Our Supreme Court has held, however, that a specific unanimity requirement is necessary "in cases where there is a danger of a fragmented verdict" and, in such cases, "the trial court must upon request offer a specific unanimity instruction." Id. at 637 (quoting United States v. North, 910 F.2d 843, 875 (D.C. Cir. 1990)). This circumstance can arise where the facts are "exceptionally complex" or where there is a variance between the indictment and the trial proofs. Id. at 636. Moreover, "[a]lthough such a charge should be granted on request, in the absence of a specific request, the failure so to charge does not necessarily constitute reversible error." Id. at 637. The "core question" in such cases is whether the "instructions 'as a whole posed a genuine risk that the jury would be confused.'" Id. at 638 (quoting North, 910 F.2d at 951).

28

Here, the judge gave a general unanimity charge, in accord with the Model Jury Charges (Criminal), "Criminal Final Charge" (rev. May 12, 2014). At the end of the instructions, the judge stated in pertinent part:

> You are to apply the law as I have instructed you to the facts as you find them to be for the purpose of arriving at a fair and correct verdict. The verdict must represent the considered judgment of each juror and must be unanimous as to each charge. This means all of you must agree if the defendant is guilty or not guilty on each charge. That would apply to the issue of self-defense as well.
>
> . . . .
>
> You may return on each crime charged a verdict of either not guilty or guilty. Your verdict, whatever it may be as to each crime charged, or the issue of self-defense, must be unanimous. Each of the [twelve] members of the deliberating jury must agree as to the verdict.
>
> [Emphasis added.]

We are satisfied that the charge given was sufficient. The State did not advance different theories based on different acts and different evidence. Moreover, nothing in our jurisprudence suggests that the jury's findings need be unanimous on how the State disproves self-defense so long as the jury unanimously agrees that the State disproved self-defense beyond a reasonable doubt. See, e.g., Model Jury Charges (Criminal), "Justification – Self Defense

(In Self Protection) (N.J.S.A. 2C:3-4)" (rev. June 13, 2011).[10]  Nonetheless,

relying on State v. Tindell, 417 N.J. Super. 530 (App. Div. 2011), defendant

asserts a specific unanimity instruction was required.

In Tindell, we held:

> The risk of a non-unanimous verdict occurs if, as here, there are multiple alleged victims who are not separately identified in the charging instrument, by name or by such other characteristics as to enable a reasonable person to ascertain their identity as the victims of the crime, and are not specifically identified as such in the jury charge and on the verdict sheet. Here, the nature of the alleged threats and the circumstances surrounding them required that the victims be identified with particularity.  Without such specificity, there is a distinct and legally unacceptable risk that a jury may return a verdict that was not based on the unanimous judgment of the deliberating jurors.
>
> [Id. at 555.]

---

[10]  As for other jurisdictions, while not controlling, in People v. Mosely, 488 P.3d 1074, 1076 (Colo. 2021), the Colorado Supreme Court held that "the jury need not unanimously agree on the specific reason that self-defense was disproven, so long as it unanimously agrees that the prosecution disproved self-defense beyond a reasonable doubt."  The Court explained that self-defense was "treated as an additional element that the prosecution bears the burden of disproving," and "a jury must unanimously agree only on whether, but not how, each element of a charged offense was established[.]"  Id. at 1081.  See also State v. Mekoshvili, 223 A.3d 834, 841-43 (Conn. App. Ct. 2020) (finding "unanimity on whichever element of self-defense the jury might find to have been disproven" was not required), certif. granted, 223 A.3d 60 (Conn. 2020); Harrod v. State, 203 S.W.3d 622, 628 (Tex. App. 2006) (holding that the jury was "not required to agree unanimously on the specific component of self-defense on which it was not persuaded").

None of the concerns identified in <u>Tindell</u> that warranted a specific unanimity charge are applicable here. There were no separate evidential theories or victims presented in the State's proofs.

Defendant also relies on <u>State v. Bzura</u>, 261 N.J. Super. 602 (App. Div. 1993) to support his position, but his reliance is misplaced. In <u>Bzura</u>, the defendant was charged with false swearing under N.J.S.A. 2C:28-2(a), but the indictment actually alleged "the form of false swearing proscribed by N.J.S.A. 2C:28-2[(c)]." <u>Id.</u> at 613. Although the trial judge allowed the State "to amend the indictment to allege a violation of N.J.S.A. 2C:28-2[(c)] rather than N.J.S.A. 2C:28-2[(a),]" the judge delivered jury instructions that described elements of both false swearing offenses. <u>Id.</u> at 613-615.

In reversing defendant's false swearing conviction, we held:

> [T]he jury instruction would have permitted some jurors to vote for a guilty verdict based on the form of false swearing proscribed by N.J.S.A. 2C:28-2(a), . . . while permitting other jurors to find guilt based on the form of false swearing proscribed by N.J.S.A. 2C:28-2(c) . . . . To permit individual jurors to agree on a guilty verdict based on such different factual predicates would countenance a non-unanimous jury verdict . . . .
>
> [<u>Id.</u> at 614-15.]

The facts here are clearly distinguishable.

31

Likewise, defendant's reliance on State v. Jackson, 326 N.J. Super. 276 (App. Div. 1999) and Frisby, 174 N.J. at 593, is misguided. In Jackson, we held that although the State had established a prima facie case that the defendant possessed cocaine found in the pocket of some pants, the evidence was insufficient to establish a prima facie case that the defendant possessed other cocaine found in a dresser drawer. 326 N.J. Super. at 279. Because the jury charge failed to distinguish between the two, we concluded "it [was] possible that some of the jurors convicted defendant based only on possession of cocaine found in the dresser drawer. Thus, the jury's required unanimity was compromised." Id. at 282.

In Frisby, the State offered two separate theories to support the charge of endangering the welfare of a child: 1) injuring the child or failing to properly supervise him, which resulted in the injury; or 2) abandoning the child. 174 N.J. at 599. To that end, the State advanced different theories "based on different acts and entirely different evidence." Ibid. Our Supreme Court held because "the allegations . . . were 'contradictory,' 'conceptually distinct,' and not even 'marginally related' to each other," the general unanimity charge was insufficient and a more specific unanimity instruction was required. Id. at 599-600.

In contrast, here, the State's evidence was uncomplicated. The State did not try to prove that defendant committed the crime by presenting different theories based on different acts or different evidence. The State presented only one theory to support the charge of reckless manslaughter — defendant and Gaffney engaged in a fist fight, which ended in defendant shooting and killing Gaffney. Thus, there was no danger of a fragmented verdict and a specific unanimity charge was not required. The judge's charge was appropriate and did not sanction a non-unanimous verdict.

As to jury confusion, we are satisfied that any initial confusion the jury may have had about the self-defense charge was remedied by the judge's answers to the jury's questions and the judge's supplemental instructions, which were sanctioned by both parties. It is firmly established that "[w]hen a jury requests clarification," the trial court "is obligated to clear the confusion." State v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984). If the jury's question is ambiguous, the trial court must clarify the jury's inquiry by ascertaining the meaning of its request. State v. Graham, 285 N.J. Super. 337, 342 (App. Div. 1995). Here, the judge satisfied his obligation as evidenced by the fact that the jury had no further questions or requests for clarification of the self-defense charge. See State v. McClain, 248 N.J. Super. 409, 421 (App. Div. 1991) ("The

failure of the jury to ask for further clarification or indicate confusion [after readback of jury charge] demonstrates that the response was satisfactory.").

IV.

In Point III, defendant argues for the first time on appeal that the judge gave an erroneous instruction on "the timing with regard to the duty to retreat" in connection with the self-defense charge. Specifically, he argues the judge should have instructed the jury that the duty to retreat was "at the moment of the use of deadly force" and not "after the second altercation."

After the final charge, the jury sent out a note, asking "Does the 'encounter' begin when Gaffney came out of the bar or when [defendant] was on the ground?" With the agreement of the parties, the judge responded, "When the third encounter begins is for you to decide. However, it must be after the defendant and Mr. Gaffney reconciled." Later that same day, with the agreement of the parties, the judge further clarified the duty to retreat, telling the jurors "the duty to retreat applies when the defendant resorts to the use of deadly force. So[,] when you're considering the opportunity to retreat, it must be as of the time deadly force is used."

On the next court day, following discussions with the parties regarding "the jury's request for clarification of certain issues" related to the self-defense

34

charge, the judge determined with the agreement of the parties that it would be "prudent to provide [the jury] with a revised charge on self-defense." The judge then gave the jury the revised instructions after the parties reviewed and agreed on them. As to the duty to retreat, in the revised instructions, the judge told the jury:

> In your inquiry as to whether the defendant knew that an opportunity to retreat with complete safety was available, the total circumstances including the attendant excitement accompanying the situation must be considered. You must consider the defendant's ability to retreat at the time that the defendant decided to use deadly force.

Neither party objected to the revised instruction. Indeed, the prosecutor stated he and defense counsel "worked on the language yesterday and it's acceptable." Nonetheless, on appeal, defendant now argues the revised instruction on the "duty to retreat" was erroneous. However, we find no error, let alone plain error, in the instruction.

The general rule is that a person is not justified in using deadly force if he may avoid death or serious bodily injury by retreating. N.J.S.A. 2C:3-4(b)(2). "The Code requires that if a person 'knows that he can avoid the necessity of using [deadly] force with complete safety by retreating,' he must do so or lose self-defense as a justification for his conduct." State v. Rodriguez, 195 N.J. 165,

35

175 (2008) (alteration in original) (quoting N.J.S.A. 2C:3-4(b)(2)(b)). The duty to retreat arises only in cases involving deadly force. Stated differently, there is no duty to retreat unless deadly force is used. See State v. Moore, 158 N.J. 292, 304, 308-11 (1999) (explaining there is no duty to retreat where the actor "display[s] or brandish[es] a firearm . . . when the need for self-protection is reasonably perceived and he merely intends to create an apprehension in the aggressor that he will use deadly force if necessary" (quoting State v. Harmon, 203 N.J. Super. 216, 223 (App. Div. 1985), rev'd on other grounds, 104 N.J. 189 (1986))). There is also no duty to retreat unless one "can do so safely." State v. Gartland, 149 N.J. 456, 467 (1997).

Here, the judge properly instructed the jury that defendant's duty to retreat arose when he decided to use deadly force. Up until that point in time, defendant did not have a duty to retreat. Consequently, there was no error in the judge's revised instructions.

## V.

In Point IV, defendant argues the judge deprived him of his right to "fully cross-examine" one of the State's witnesses, Robert Lima. We disagree.

On numerous occasions during Lima's cross-examination, defense counsel contrasted Lima's recollection of events on the night in question with the

videotape, while injecting counsel's own observations of the video. The prosecutor eventually asked to be heard at sidebar:

> I think we've established Mr. Lima remembers a different sequence than on the video. I just want to be careful moving forward and I don't think counsel is doing this purposely, but injecting helpful facts that enlarge contradiction, so if he could just keep – maybe just the time frame, describing what the parties are doing in the time frame almost as a refreshed recollection . . . . So[,] I'm just asking you isolate it to the minute and time without the over editorialization.

The judge responded to the prosecutor's objection as follows:

> Here is what I'm seeing. I'm seeing that the defense is seeking an advantage, playing out discrepancies between the witness' recollection and the tape. However, when the discrepancy is found, the defense goes forward and tries to amplify the difference by switching between temporal positioning, meaning what the witness recalls and what the witness is seeing today on the tape to try to broaden the gap between the discrepancy. I think we're now at the point where it's confusing the jury in the sense of it's taking away from what this witness says he recalls and now we're getting into an exposition on what this witness believes he sees on the tape. The witness has recounted the events as he recalls them twice now. The tape is the tape, and arguments can be made from the tape with regard to the reliability and credibility of this witness. I think at this point we're now getting into an area where the jurors are going to end up being confused and we're not serving a useful purpose through this exercise.

Defense counsel disagreed with the judge's assessment, saying:

A-5473-17

I'm going back and forth to make sure we're talking about the same thing and always differentiating what is on the video and what he recalls. This is cross-examination. I can lead this witness. I want to show the jury that he is manufacturing. He's embellishing. His memory is abysmally bad and he does invent things; and when we go back and review the tape he sees that it doesn't square with what he said, and then we need to probe so that the jury sees this witness is abysmally unreliable.

In response, the judge told defense counsel his method was improper and suggested "show[ing Lima] the tape and ask[ing] him if he believe[d] the tape show[ed] what he recalled." According to the judge, that way, Lima will "give you a yes or no" answer. The following colloquy ensued:

> [DEFENSE COUNSEL]: This little incident right here, the second push. There's a question of the first push and second push. He said it was the first push. He acknowledged it. His position conformed with the video. Okay. We're good. Now we have a second fight. He's saying that Macchia goes after Gaffney. I'm using the push as a point of reference in the testimony to show it's manifestly false. He didn't go after him.
>
> [COURT]: The issue whether or not he went after him is an issue to be decided by the jury upon viewing the tape. It's not going to depend upon whether or not the witness agrees with what the tape shows. What I would like to have happen, I would like to stop the practice of going back and forth between the tape and the witness' testimony and trying to in a positive feedback way have the witness continue to be impeached. It's not serving a purpose. You'll have your arguments.

A-5473-17

[DEFENSE COUNSEL]: This is the first time in my entire career impeaching a State's witness is considered a bad thing. That's the essence of cross-examination.

[COURT]: That's not what I'm saying. <u>The practice that you're employing is confusing and misleading to the jury. It is not serving a useful purpose.</u> You have your grounds for argument from impeachment. I'm not saying you can't question this witness. What I'm saying, you have to change your method.

[Emphasis added.]

Following the sidebar discussion, defense counsel continued to question Lima using the surveillance videotape. Neither the prosecutor nor the court interjected.

"Both the federal and New Jersey constitutions guarantee criminal defendants the right 'to be confronted with the witnesses against'" them. <u>State v. Budis</u>, 125 N.J. 519, 530 (1991) (quoting <u>U.S. Const.</u> amend. VI; <u>N.J. Const.</u> art. I, para. 10). "The right to cross-examine is an essential element of that right." <u>State v. Harvey</u>, 151 N.J. 117, 188 (1997). The right of confrontation affords defendants the opportunity "to cross-examine the state's witnesses" and "protects against improper restrictions on questions defense counsel may ask during cross-examination." <u>Budis</u>, 125 N.J. at 530-31. "It further encompasses the right to elicit favorable testimony on cross-examination of the state's

witnesses." Id. at 531. Nevertheless, "evidence helpful to the defense" may be excluded "if exclusion serves the interests of fairness and reliability." Id. at 531-32. "Thus, a defendant's constitutional right to confrontation does not guarantee unlimited cross-examination of a witness." Harvey, 151 N.J. at 188.

"The scope of cross-examination . . . rests within the sound discretion of the trial court." Ibid.; see also N.J.R.E. 611(a)(3) and (b) (allowing the court to exercise reasonable control over cross-examination to "protect witnesses from harassment or undue embarrassment"). "[T]rial courts 'retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Budis, 125 N.J. at 532 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). Indeed, "a cross-examiner does not have a license to roam at will under the guise of impeaching credibility." State v. Engel, 249 N.J. Super. 336, 375 (App. Div. 1991). "A trial judge has broad discretion to determine the proper limits of cross-examination of a witness whose credibility is put in issue." Ibid. We "will not interfere with [the trial court's] control [of cross-examination] unless clear error and prejudice are shown." State v. Gaikwad, 349 N.J. Super. 62, 86-87

(App. Div. 2002) (quoting State v. Murray, 240 N.J. Super. 378, 394 (App. Div. 1990)).

Here, we discern no abuse of discretion in the judge limiting defense counsel's method of going "back and forth" between Lima's testimony and the videotape based on the judge's determination that the methodology was "confusing and misleading to the jury." Notably, the judge did not stop defense counsel from questioning Lima or from using the videotape; rather, the judge simply instructed defense counsel to question Lima in a less confusing manner. As the judge astutely pointed out, "[t]he tape is the tape, and arguments can be made from the tape with regard to the reliability and credibility of th[e] witness" regardless of "whether or not the witness agrees with what the tape shows."

## VI.

In Point V, defendant argues the prosecutor misstated the law on self-defense and duty to retreat in summations, and the misstatement was compounded by the prosecutor's use of a PowerPoint presentation, which included the misstatement. Defendant urges, "th[e] visual imagery was extremely prejudicial," and the judge's refusal to give a curative instruction deprived him of a fair trial, warranting a reversal of his conviction.

41

During summation, the prosecutor argued, "There are options that were not taken. [Defendant] could have left in complete safety between the final encounter and the second [sic] encounter. His wife asked him to go. He doesn't." Defense counsel promptly objected. The judge sustained the objection and instructed the jury to "disregard the last comment by the prosecutor."

The prosecutor continued, "At the time another option that's available to a trained officer, [defendant], is to call 9-1-1. Now, clearly he's getting beaten up. He's getting beaten repeatedly in the face. He can't do that to himself. He can't get to his phone." Defense counsel again objected. At sidebar, defense counsel stated: "We have the visual up which is perpetuating an incorrect statement that he couldn't retreat, the second fight, which is the essence of the sustained objection. I originally asked it to be taken off. It's the first line." After viewing the screen displaying the prosecutor's PowerPoint, the judge directed the prosecutor to remove the objectionable slide and "continue with [his] argument."

Shortly thereafter, defense counsel made another objection, arguing the PowerPoint slide displayed an "[i]ncorrect statement of the law." Defense counsel stated: "It's not provoke, it's provoke with intent to cause serious bodily injury or death, and that's the essence of the difficulty here." The judge

A-5473-17

responded he did not "see any harm" and did not "see a necessity for [a] curative instruction" because defense counsel had "given a clear explanation of the law" during his summations and the judge would "give a clear explanation of the law" during the final charge. Further, according to the judge, "the jury [would] be instructed to disregard anything that differs from" the court's instructions on the law.

"[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are therefore "afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). In other words, as long as the prosecutor "stays within the evidence and the legitimate inferences therefrom," State v. R.B., 183 N.J. 308, 330 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)), "[t]here is no error," State v. Carter, 91 N.J. 86, 125 (1982). In that regard, "[v]isual aids such as PowerPoint presentations" are permissible in closing arguments but "must adhere to the same standards as counsels' spoken words." State v. Williams, 244 N.J. 592, 617 (2021).

On the other hand, "prosecutors may not advance improper arguments," State v. Lazo, 209 N.J. 9, 29 (2012), and "[i]t is as much [the prosecutor's] duty

to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one," Frost, 158 N.J. at 83 (quoting State v. Farrell, 61 N.J. 99, 105 (1972)).  Nonetheless, "even when a prosecutor's remarks stray over the line of permissible commentary," reversal of a conviction is not automatically required.  State v. McNeil-Thomas, 238 N.J. 256, 275 (2019).  Rather, "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial" is weighed, and a conviction is reversed only if "the conduct was so egregious as to deprive defendant of a fair trial."  State v. Wakefield, 190 N.J. 397, 437 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)); see State v. Jackson, 211 N.J. 394, 408-09 (2012) ("'[N]ot every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal." (quoting State v. Williams, 113 N.J. 393, 452 (1988))).

"Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  Jackson, 211 N.J. at 409 (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988)).  A determination as to whether a prosecutor's comments had the capacity to deprive defendant of a fair trial must be made "within the context of the trial as

a whole." State v. Feaster, 156 N.J. 1, 64 (1998). To warrant reversal, there must have been "some degree of possibility that [the prosecutor's comments] led to an unjust result." R.B., 183 N.J. at 330 (quoting State v. Bankston, 63 N.J. 263, 273 (1973)). That "possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting Bankston, 63 N.J. at 273).

Here, following defense counsel's objection, the judge instructed the jury to disregard the prosecutor's comment regarding when defendant could have left the scene. Additionally, the judge instructed the prosecutor to remove the objectionable slide from his PowerPoint presentation, thereby minimizing any prejudice.[11] What is more, in accordance with the Model Jury Charges, in the final charge, the judge instructed the jury:

> You must accept and apply this law for this case as I give it to you in this charge. Any ideas you have of what the law is or what the law should be or any statements by the attorneys as to what the law may be

---

[11] In Williams, 244 N.J. at 616, the Court stated "[t]o avoid objection or possible error, we encourage counsel to disclose to each other and the court any visual aids intended to be used during closing argument, but we do not require that practice." It is unclear in the record whether the PowerPoint presentation was disclosed to counsel and the court prior to summations, but, as the Court stated, such disclosure is not required. Ibid.

must be disregarded by you if they are in conflict with my charge.

. . . .

Arguments, statements, remarks, openings, and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial. Whether or not the defendant has been proven guilty beyond a reasonable doubt is for you to determine based on all of the evidence presented during the trial. Any comments by counsel are not controlling.

We are satisfied that the judge's instruction on the applicable law and the import of any contrary statements by the attorneys as to the applicable law sufficed to cure any error. "The authority is abundant that courts presume juries follow instructions." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019).

## VII.

In Point VI, defendant argues the judge erred in "admitting many highly prejudicial hearsay statements of Gaffney through the trial testimony of Robert Lima." We disagree.

Pre-trial, the State moved to admit through Lima's testimony three hearsay statements Gaffney allegedly made to defendant prior to being shot: 1) "I'm

done"; 2) "What's going on here?";[12] and 3) "Stop, stop, stop." The State argued Gaffney's statements were admissible under the state-of-mind exception to the hearsay rule, N.J.R.E. 803(c)(3), and were relevant because "the verbal jousting and repartee between Gaffney and [d]efendant [were] a central feature of the case." In response, defense counsel argued Gaffney's statements were not relevant and Lima's recollection was so poor that it was inherently unreliable and thus excludable under N.J.R.E. 403.[13]

In a written opinion issued May 14, 2018, the judge granted the State's motion. Initially, the judge found Gaffney's statements were "relevant to the issues of the reasonableness of [d]efendant's use of deadly force; opportunity to retreat; and provocation." Further, according to the judge, the statements were "not unfounded speculation or a general statement of fear"; instead, they were "contemporaneous expressions of intent made directly to the [d]efendant" and "reflect[ed] Gaffney's mental . . . condition." Additionally, "although two separate altercations occurred," according to the judge, because "there was no cooling down period between the two" and "[b]oth [d]efendant and Gaffney

---

[12] The statement "What's going on here?" was never testified to at trial by any witness.

[13] Defendant did not object to similar hearsay statements made by Vinsko.

were under the stress of the events," the statements "were made without the opportunity to fabricate." Thus, the judge admitted the statements under the state-of-mind exception to the hearsay rule, N.J.R.E. 803(c)(3), as well as the excited utterance exception to the hearsay rule, N.J.R.E. 803(c)(2).[14]

Further, in rejecting defendant's argument that Lima's testimony was excludable under N.J.R.E. 403 due to the unreliability of Lima's recollection, the judge found "[t]he probative value of the evidence [was] not substantially outweighed by its potential prejudice." The judge explained:

> The [c]ourt has no doubt that Mr. Lima was a legally competent witness. There is no indicia of fraud or any abuse of the integrity of the [c]ourt that would warrant the court to preclude his testimony. The defense is free to attack his recollection and credibility on cross-examination before the jury.

We review "the trial court's evidentiary rulings for abuse of discretion." State v. Gorthy, 226 N.J. 516, 539 (2016). Thus, "trial courts are granted broad discretion in making decisions regarding evidentiary matters, such as whether a piece of evidence is relevant . . . and whether a particular hearsay statement is

---

[14] The judge further noted that if the statements were not being offered for the truth of the matter asserted, "but to show that [d]efendant was aggressive after the end of the first fight," then they were also "admissible as non-hearsay evidence."

admissible under an appropriate exception." State v. Scharf, 225 N.J. 547, 572 (2016) (citations omitted).

When a declarant's "state of mind . . . is at issue in a case," N.J.R.E. 803(c)(3) "allows admission of extrajudicial statements to show the [declarant's] state of mind." State v. Benedetto, 120 N.J. 250, 255-56 (1990). Specifically, under N.J.R.E. 803(c)(3), a statement is admissible if it was "made in good faith" and described "the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed."

"The necessary predicate to admission of such evidence is that: a) the statement reflects a mental or physical condition of the declarant which constitutes a genuine issue in the case; or b) the statement is otherwise relevant to prove or explain the declarant's conduct." State v. Downey, 206 N.J. Super. 382, 390 (App. Div. 1986). That said, "[t]he 'state of mind' hearsay exception should be construed narrowly, focusing specifically on the declarant's state of mind and whether that state of mind is directly relevant to the issues at trial." State v. McLaughlin, 205 N.J. 185, 189 (2011).

"[W]hen a victim's state-of-mind hearsay statements are relevant to show the declarant's own conduct, and when such conduct is known or probably known to the defendant, it also can give rise to motive, and the statements become admissible for that purpose, subject to the usual balancing under N.J.R.E. 403." State v. Calleia, 206 N.J. 274, 296 (2011). "When a victim's projected conduct permits an inference that defendant may have been motivated by that conduct to act in the manner alleged by the prosecution, the statement satisfies the threshold for relevance." Ibid.; see, e.g., State v. Rogers, 19 N.J. 218, 228 (1955) ("All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible . . . ."). "Of course, trial courts should remain vigilant to ensure that an evidentiary submission's probative value is not substantially outweighed by prejudicial effect." Calleia, 206 N.J. at 297 (citing N.J.R.E. 403).

"Particularly where the declarant is deceased, the rule is rooted in necessity and justified upon the basis that the circumstances provide a rational substitute for the benefit of cross-examination." Downey, 206 N.J. Super. at 390. "It is said that the purpose and object underlying the confrontation requirement are satisfied because the circumstances afford a sufficient guarantee of testimonial trustworthiness to justify admission." Ibid. Thus, the victim's

50

state of mind is a relevant issue to be decided by the jury where there is "an issue as to whether a deceased might have harbored a suicidal design," or "was accidentally killed," or "so feared the accused that he was an unlikely aggressor where the justification of self-defense is raised." Id. at 391. Even "[w]hen the victim's declarations do not express fear of the defendant, they might be admissible . . . as a declaration of the victim's state of mind." State v. Machado, 111 N.J. 480, 489 (1988).

Here, the judge acknowledged for the State to overcome defendant's self-defense claim, it would have to prove:

> 1) [d]efendant's belief that the use of deadly force was necessary to save his own life or to avoid serious bodily injury was not honest or reasonable; or 2) although [d]efendant's belief was honest and reasonable, [d]efendant was the aggressor; or 3) although [d]efendant's belief was honest and reasonable, and [d]efendant was not the aggressor, [d]efendant could have retreated in complete safety.

The judge correctly concluded Gaffney's statements were relevant and admissible to show Gaffney's actions in response to defendant's conduct and "that defendant may have been motivated . . . to act in the manner alleged by the prosecution." Calleia, 206 N.J. at 296.

As noted, alternatively, the judge found Gaffney's statements were admissible as excited utterances under N.J.R.E. 803(c)(2). Under the Rule, three

conditions must be met. The statement must be: 1) related to a startling event; 2) made under the stress of excitement caused by the event; and 3) made without opportunity for the declarant to deliberate or fabricate. State ex rel. J.A., 195 N.J. 324, 340 (2008). Here, the evidence submitted at the pretrial hearing, which included the videotape and witness testimony, clearly showed Gaffney was under the stress of the fight when he made the statements and had no opportunity to deliberate or fabricate. Thus, we discern no abuse of discretion in the judge's alternative admissibility ruling.

Defendant further argues that Gaffney's statements should have been excluded under N.J.R.E. 403(a). The Rule "mandates the exclusion of evidence that is otherwise admissible 'if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.'" State v. Cole, 229 N.J. 430, 448 (2017) (quoting N.J.R.E 403). We see no basis to question the judge's balancing of the pertinent factors and finding that N.J.R.E. 403(a) did not warrant exclusion of the evidence.

## VIII.

In Point VII, defendant argues the judge committed error by failing to provide a limiting instruction for Lima's testimony regarding the hearsay

statements Gaffney made during his encounter with defendant. Because defendant did not raise this issue at trial, we again review under the plain error standard of review. See State v. Townsend, 186 N.J. 473, 498 (2006).

In Scharf, the Court permitted the State to introduce statements made by the victim about her fear of the defendant. 225 N.J. at 572-73. The Court found these statements were "relevant to disputed, material factual issues about [the victim's] state of mind toward defendant, about her marital relationship, and about her likely conduct that were ultimately argued [at trial] where the defense was accidental death." Id. at 574-575. However, to ensure the evidence was used properly, the Court determined that a limiting instruction was necessary. Id. at 580.

One of the hearsay statements deemed admissible in Scharf was the statement the victim made to a friend that she was "very afraid for her life" and "very afraid [the defendant] was going to kill her." Id. at 562. The Court stated "[a] limiting instruction is required here to guard against the risk that the jury will consider the victim's statements of fear as evidence of the defendant's intent or actions." Id. at 581 (citing Calleia, 206 N.J. at 292). The Court explained "[s]uch state-of-mind testimony may properly be used only for evaluating the

victim's actions or the likelihood of him or her acting in a certain way"; and "the evidence may not be used as evidence of the defendant's actions or intent." Ibid.

Here, the statements that were admitted, "I'm done" and "Stop," were clearly admitted as evidence of Gaffney's state of mind and actions, namely, his desire to discontinue the fight with defendant. Unlike Scharf, there was no clear risk the jury could have considered these statements as evidence of defendant's "actions or intent." Ibid. Thus, we conclude the judge's failure to provide a limiting instruction following Lima's testimony did not have the capacity to produce "an unjust result." R. 2:10-2.

In any event, "the prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances." Townsend, 186 N.J. at 499 (quoting State v. Marshall, 123 N.J. 1, 145 (1991)). The evidence against defendant was significant. The jurors had the benefit of watching the damning surveillance videotape for themselves as well as hearing multiple witnesses' accounts of how the fight between Gaffney and defendant evolved. See Walker, 203 N.J. at 90 (finding the effect of any error must be considered "in light 'of the overall strength of the State's case'" (quoting Chapland, 187 N.J. at 289)).

IX.

In Point VIII, defendant argues the judge erred in denying his motion for a judgment of acquittal as the State did not "prove beyond a reasonable doubt that defendant did not reasonably and honestly believe that it was immediately necessary for him to use deadly force to prevent Gaffney from inflicting death or serious bodily injury upon him." Defendant also argues the State "failed to prove beyond a reasonable doubt that defendant provoked the use of force against himself in the encounter, with the purpose of causing serious bodily injury or death to Gaffney" and "failed to prove beyond a reasonable doubt that defendant had an opportunity to retreat in complete safety at the time that he resorted to the use of deadly force against Gaffney."

At the conclusion of the State's case, defense counsel moved for a judgment of acquittal, arguing "no reasonable jury could conclude beyond a reasonable doubt that the State has disproven the claim of self-defense in this case." In denying the motion, the judge explained:

> Among the evidence that's significant is that the jurors may see this matter as a fist fight. The defendant, although he says he has a fractured nose and he had a small bone displaced in his wrist, suffered injuries that a reasonable juror might look at and say nothing different than an ordinary person would sustain in an ordinary fight and that from those injuries draw the

55

inference that at no time was the defendant facing serious bodily harm.

There's also evidence . . . from the medical examiner that if it's accepted by a juror would have [defendant] giving as good as he got to Mr. Gaffney essentially. Mr. Gaffney reportedly had multiple facial injuries that came from blunt force trauma that was not the result of him hitting the sidewalk after he had been shot dead. Furthermore, the video in this case supports the fact that he did not fall face first onto the sidewalk because he fell on top of [defendant]. I think that's plain from the video. As such he would have been cushioned in his fall.

. . . .

The description of the defendant throughout the evening after the first encounter was that he was in a highly agitated state. Those are my words, not any witness' words. He was intoxicated. He was out of control. These are conclusions that an ordinary juror could reach. And they would reach these conclusions by watching the video, listening to the testimony of him ignoring the pleas of his newly pregnant wife to go home and others. If they accepted Mr. Lima's version of the events, the victim himself was telling the defendant to leave. The jurors may listen to the excuse offered by the defendant of wanting to pay his bill to avoid theft of services and to get his jacket as not being honestly made, and they could listen to that and find that that is a post hoc excuse being offered by the defendant and, therefore, reflective of his mental state and purpose at the time . . . . They may find that because the defendant is seen on the video towards the end standing in front of the door and gesturing with an arm, they may find that to be the defendant was pointing to Mr. Gaffney and essentially calling Mr.

56 A-5473-17

Gaffney out after being abused by Mr. Gaffney and enraged. They may find he was so enraged he decided to kill Mr. Gaffney. That is a result that would be supported by the evidence.

With regard to the issue of retreat, in addition to everything I just mentioned, they may find that when they look at the video . . . they see the defendant reaching for his weapon as he falls. They may find that he had decided at that point to kill Mr. Gaffney. That would be a point in time that was sooner than the point being advanced by counsel as the point that the jurors must consider, that being the point advanced by counsel is the point in time where Mr. Gaffney is standing over the defendant and repeatedly striking him.

The jurors could find it was mutual combat, as I noted earlier . . . and although [defendant] was on the ground, he had an opportunity to escape, to roll over, to go away, to not go for his gun as an initial matter. These are things that a reasonable juror looking at the totality of the evidence could see and could reasonably find.

The judge stated further that once the jurors "overcome the hurdle of self-defense, the issue of manslaughter and the sufficiency of the evidence available to sustain a conviction of manslaughter . . . is patent."

Under Rule 3:18-1, a defendant is entitled to a judgment of acquittal at the close of the State's case, "if the evidence is insufficient to warrant a conviction." The test is "whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences

57

drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014) (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)). The evidence may be "direct or circumstantial," Reyes, 50 N.J. at 459, and "[i]nferences need not be established beyond a reasonable doubt." Tindell, 417 N.J. Super. at 549. "We review the record de novo in assessing whether the State presented sufficient evidence to defeat an acquittal motion." State v. Dekowski, 218 N.J. 596, 608 (2014).

Applying these principles, we conclude that based on the State's proofs, a reasonable jury could find that defendant did not act in self-defense and committed the crime of reckless manslaughter.

"Criminal homicide constitutes manslaughter when . . . [i]t is committed recklessly . . . ." N.J.S.A. 2C:11-4(b)(1). "Under the Code, exoneration on the basis of self-defense would be clearly inconsistent with a finding of manslaughter that a person recklessly killed his aggressor." Rodriguez, 195 N.J. at 172. However, under N.J.S.A. 2C:3-4(b)(2), the use of deadly force is not justifiable "unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm." Deadly force is impermissible if "[t]he actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or [t]he

actor knows that he can avoid the necessity of using such force with complete safety by retreating." Ibid. at 171-72 (quoting N.J.S.A. 2C:3-4(b)(2)).

"Self-defense exonerates a person who kills in the reasonable belief that such action was necessary to prevent his or her death or serious injury, even though this belief was later proven mistaken." Id. at 172 (quoting State v. Kelly, 97 N.J. 178, 198 (1984)). "Before resorting to deadly force, one must have both an objectively reasonable and an honest that is, sincere belief 'in the need to kill in self-defense.'" Ibid. (quoting Kelly, 97 N.J. at 198-200). "Based on the Code's own language, a person who kills in the honest and reasonable belief that the protection of his own life requires the use of deadly force does not kill recklessly." Ibid.

Thus, in order to overcome a self-defense claim, the State is required to prove that: 1) defendant's belief that the use of deadly force was necessary to save his own life or to avoid serious bodily injury was not honest or reasonable; or 2) although defendant's belief was honest and reasonable, defendant was the aggressor; or 3) although defendant's belief was honest and reasonable, and defendant was not the aggressor, defendant could have retreated in complete safety. See N.J.S.A. 2C:3-4(b)(2).

The State's proofs included the surveillance videotape of the fight, from which a reasonable jury could find in and of itself proof beyond a reasonable doubt that defendant did not act in self-defense.[15]  The State's proofs also included the testimony of multiple eyewitnesses, including Lima, from which a reasonable jury could conclude that defendant did not act in self-defense.  As the judge pointed out, although defendant sustained injuries during the fight, a reasonable jury could find that these injuries were not life-threatening, but injuries typically sustained in a fistfight.  While defendant argued that he did not punch or otherwise attack Gaffney, the videotape showed otherwise.  Moreover, the medical examiner testified that Gaffney sustained injuries other than the bullet wounds.  Based on the entirety of the evidence, we agree with the judge that a jury could find beyond a reasonable doubt the State disproved defendant's claim of self-defense and proved defendant was guilty of reckless manslaughter.

## X.

In Point IX, defendant argues the cumulative effect of the trial errors undermined his rights to due process and a fair trial, warranting reversal of his

---

[15]  Our review of the surveillance videotape supports the State's position that Gaffney did not reach — or even attempt to reach — for defendant's gun.

conviction. "We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). However, here, because we conclude there were no reversible errors either alone or combined, defendant's cumulative error argument must also fail.

In Point IX, defendant also argues the judge erred in "overruling a defense objection" to the readback of his cross-examination only, in response to the jury's request for same. On the fourth day of deliberations,[16] the jury sent a note requesting a "read back of defendant's testimony while on the stand, specifically just the prosecutor's cross-examination part." Over the State's objection, defense counsel asked the judge to essentially read back defendant's entire testimony.

In denying counsel's request, the judge stated:

> I'm going to deny the defendant's request for the following reasons. One, the question is specific and emphatic. The word "just" is underlined which to me indicates that the jurors have considered the testimony as a whole and have determined for whatever reason that they only want to hear the cross-examination. I understand the arguments of defense counsel. However, those arguments assume or presuppose that the jurors need to be reminded of what happened on direct. Here, as I said, from the phrasing of the specific

---

[16] The jury returned its verdict on the fifth day of deliberations.

question itself, it appears to the court that they are mindful of it but for their own reasons wish only to hear cross-examination. I don't see that the interests of justice would be offended by answering their specific question and, therefore, I'm denying the request.

"Jurors should not be required to watch or hear more testimony than they ask for." State v. Miller, 205 N.J. 109, 123 (2011) (citing State v. Wilson, 165 N.J. 657, 661 (2000)).

[W]here a request is clearly circumscribed, the trial court has no obligation to compel jurors to hear testimony they have not asked for or to continue a read back after they have expressly indicated that they have heard enough. That is so even if one of the parties registers a request for a further read back.

[Wilson, 165 N.J. at 661 (citations omitted).]

"Courts have broad discretion as to whether and how to conduct read-backs and playbacks." Miller, 205 N.J. at 122. Here, we discern no abuse of the judge's discretionary authority. The jury's request was clear and specific. Thus, the judge was under no obligation to read back defendant's direct examination in addition to his cross-examination, despite defense counsel's request.

## XI.

In Point X, defendant argues that because the mitigating factors substantially outweighed the aggravating factors, the judge should have downgraded his sentence to the range for a third-degree offense.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless 1) the sentencing guidelines were violated; 2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or 3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

At defendant's sentencing hearing, the judge found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) ("need for deterring . . . defendant and others from violating the law"), and mitigating factors three, seven, and eight, N.J.S.A. 2C:44-1(b)(3) ("defendant acted under a strong provocation"); N.J.S.A. 2C:44-1(b)(7) ("defendant has no history of prior delinquency or criminal activity");

63

N.J.S.A. 2C:44-1(b)(8) ("defendant's conduct was the result of circumstances unlikely to recur").[17]

Although the judge found the mitigating factors "substantially outweigh[ed]" the sole aggravating factor, the judge "decline[d] to downgrade" defendant's sentence to the third-degree range. Citing N.J.S.A. 2C:44-1(f)(2),

---

[17] We reject defendant's contention that the judge erred in his evaluation and rejection of mitigating factors two, four, five, nine, ten, and eleven. As to factor two, N.J.S.A. 44-1(b)(2) ("defendant did not contemplate that [his] conduct would cause or threaten serious harm"), the judge found it "inapplicable" because the evidence showed "defendant knew he was using deadly force at the time he used it." As to factor four, N.J.S.A. 44-1(b)(4) ("substantial grounds [exist] tending to excuse or justify the defendant's conduct, though failing to establish a defense"), the judge stated defendant "picked a fight" with Gaffney after the two had reconciled, and when defendant started "losing, he used his weapon without legal justification." Similarly, the judge rejected factor five, N.J.S.A. 44-1(b)(5) (the victim "induced or facilitated" the commission of the crime), because defendant "reinstituted the dispute after reconciliation." As to factor nine, N.J.S.A. 44-1(b)(9) ("[t]he character and attitude of the defendant indicate that [he] is unlikely to commit another offense"), despite the numerous letters submitted regarding defendant's good character, the judge, citing State v. O'Donnell, 117 N.J. 210 (1980), found there was "a lack of true remorse" on defendant's part. As to factor ten, N.J.S.A. 44-1(b)(10) (defendant would "respond affirmatively to probationary treatment"), the judge found this factor "inapplicable" as defendant was convicted of a second-degree crime which carried a presumption of imprisonment. Finally, as to factor eleven, N.J.S.A. 2C:44-1(b)(11) (defendant's "imprisonment . . . would entail excessive hardship"), the judge found, that while defendant would suffer some hardship, he failed to show how such hardship was beyond those "common to all persons . . . subject to prolonged incarceration." As to factor six, N.J.S.A. 44-1(b)(6) (defendant would "compensate the victim" or "participate in a program of community service"), defendant conceded its inapplicability.

which permits a sentence one degree lower where "the interest of justice demands," the judge explained:

> In [State v.] Megargel, [143 N.J. 484, 501-502 (1996)], our Supreme Court held that in determining what is in the interest of justice, the defendant must come forward with compelling reasons that are, "[i]n addition to and separate from," the factors argued in mitigation . . . . There must be truly, extraordinary, and unanticipated circumstances to overcome the presumption of imprisonment.
>
> [D]efense counsel lists what are argued as compelling factors in . . . his submission . . . .  I find that . . . counsel's points did not make compelling reasons. Instead, they served to highlight that defendant should have known better.  As a police officer, he should not have drunk to excess, having [six] beers and two Jack Daniels in . . . the [little] time he was at the bar, and certainly he shouldn't have done it while he was armed. He should not have brushed his pregnant wife aside when she was begging him to leave and physically trying to direct him away.  He should not have ignored the pleas of, literally, the entire bar who were telling him to go.  He should not have persisted in picking a fight with a much larger and stronger man who he believed to be using illegal drugs.  He should not have remained in an establishment where he believed patrons were using illegal drugs.  Furthermore, counsel's recollection of events is not accurate, in the [c]ourt's estimation, when he says [defendant] was always retreating and never threw a punch.  The video shows otherwise.  There's nothing unique about [defendant] as a person.  For example, this is not a case involving mental retardation or other similar, unique circumstance for the [c]ourt to consider.  To put it

succinctly there are no compelling reasons to downgrade here.

Sentencing a first- or second-degree offender to a sentence one degree lower is governed by N.J.S.A. 2C:44-1(f)(2), which provides, in pertinent part:

> In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.

In Megargel, our Supreme Court observed that "the standard governing downgrading is high," and proceeded to provide guidance on when a defendant's first- or second-degree conviction should be downgraded pursuant to the statutory framework. 143 N.J. at 500. Specifically, the Court established a two-part test: 1) "[t]he court must be 'clearly convinced that the mitigating factors substantially outweigh the aggravating ones'"; and 2) "that the interest of justice demand[s] a downgraded sentence." Id. at 496 (quoting N.J.S.A. 2C:44-1(f)(2)). The Court further explained that in applying this test, "the severity of the crime" is "the most . . . important factor . . . ." Id. at 500 (citing State v. Hodge, 95 N.J. 369, 379 (1984)).

The Court continued, "[i]n evaluating the severity of the crime, the trial court must consider the nature of and the relevant circumstances pertaining to

the offense," including if "[t]he surrounding circumstances" make the offense "very similar to a lower degree offense, thus suggesting that a downgraded sentence may be appropriate." Id. at 500. Although trial courts may consider "facts personal to the defendant" including "a defendant's role in the incident to determine the need to deter him from further crimes and the corresponding need to protect the public from him," the focus should be the crime itself. Id. at 501 (citing State v. Jarbath, 114 N.J. 394, 407 (1989)). The Court explained "[t]he paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protection and the more need for deterrence." Id. at 500.

Additionally, "[t]he decision to downgrade a defendant's sentence 'in the interest of justice' should be limited to those circumstances in which defendant can provide 'compelling' reasons for the downgrade." Id. at 501-02 (quoting State v. Jones, 197 N.J. Super. 604, 607 (App. Div. 1984)). "These reasons must be in addition to, and separate from, the 'mitigating factors which substantially outweigh the aggravating factors,' that the trial court finds applicable to a defendant under the first prong of [N.J.S.A. 2C:44-1(f)(2)]." Id. at 502.

67

Here, the judge found no "compelling reasons" to sentence defendant in the third-degree range despite defendant's arguments to the contrary. Instead, based on the balancing of the aggravating and mitigating factors, the judge sentenced defendant to the lower end of the second-degree range. See Case, 220 N.J. at 64-65 ("[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." (quoting State v. Natale, 184 N.J. 458, 488 (2005))).

Defendant's reliance on State v. L.V., 410 N.J. Super. 90 (App. Div. 2009), to support his argument for a downgraded sentence is misplaced. In L.V., we determined that "the high standard governing downgrading [a sentence]" under N.J.S.A. 2C:44-1(f)(2) was met. Id. at 112. We held that "[t]he judge erred in refusing to sentence defendant as a third-degree offender," id. at 113, for "second-degree aggravated assault and second-degree reckless manslaughter" stemming from her throwing her two newborn babies out the window at the direction of her abusive father, leading to the death of the first child and severe injuries to the second. Id. at 93-96. The babies were conceived from her father's repeated and pervasive sexual molestation of defendant over a five-year period.

Id. at 93-96.  The first child was born when defendant was sixteen years old and the second was born when defendant was eighteen years old.  Id. at 95-96.

In L.V., the record revealed that the defendant was "a person of very limited intelligence, functioning at a level in school initially below a five-year-old child and by the time of the crimes at the level of a six-year-old child."  Id. at 112.  She had "a severe language disorder and severe deficits in comprehension and syntax" and suffered "from PTSD and Major Depressive Disorder."  Ibid.  Further:

> The circumstances surrounding her behavior were extreme and severe.  She had been raped by her father repeatedly for years, causing impairment of her judgment and decision-making ability.  She felt powerless toward her father and feared for her life and that of her mother.  Her cognitive limitations impaired her ability to seek help with respect to the rapes and her pregnancies and affected her desire not to have her babies abused, and she was socially isolated by her abusive father.  Her cultural and language barriers and her lack of assimilation into the community also prevented her from seeking help.
>
> [Id. at 112-13.]

Clearly, those circumstances do not obtain here.

In sum, because the judge's findings were supported by the record, comported with the sentencing guidelines, and do not shock the judicial conscience, we discern no abuse of the judge's sentencing discretion.

69

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5473-17